**K–MART CORPORATION et al.**

v.

**MIDCON REALTY GROUP OF CONNECTICUT, LTD. et al.**

Civ. No. H 79–496.

United States District Court,
D. Connecticut.

May 7, 1980.

814

Robert Louis Genuario, Norwalk, Conn. (Keogh, Candee & Burkhart), for plaintiffs.

Richard C. Robinson, Hartford, Conn. (Sorokin, Sorokin, Hurwitz, Wetstone, Rabinovitz & Gasser), for defendant Lawrence H. Furman.

### RULING ON MOTION OF DEFENDANT LAWRENCE H. FURMAN TO DISMISS COUNT IX OF THE COMPLAINT

JOSÉ A. CABRANES, District Judge:

This case has its origin in the collapse of part of the roof of a retail store in Manchester, Connecticut in January 1978. Plaintiffs K-Mart Corporation and K-Mart Apparel Corporation (collectively "K-Mart"), which operated the store on premises owned by Midcon Realty Group of Connecticut, Ltd. ("Midcon"), brought this action against three defendants—Midcon, which built the store and leased it to K-Mart; Peter J. Saker, Inc. ("Saker"), the general contractor for the construction of the store; and Lawrence H. Furman, the architect who designed the building.

In its complaint, K-Mart asserts two claims against Furman. In Count VIII, K-Mart alleges that Furman, who was retained by Midcon to design the building, negligently drafted plans for a structure which was incapable of surviving anticipated weather conditions and was unsafe for its intended uses, and failed to take reasonable steps to warn K-Mart of the dangers caused by his designs. In Count IX, which is the subject of the motion now before the court, K-Mart alleges that, as a result of Furman's sale to Midcon of "working drawings, plans and specifications" which were unreasonably dangerous to users of the building, Furman is accountable, under the doctrine of strict tort liability, for property damage sustained by K-Mart when the roof collapsed.

Furman has moved, pursuant to Rule 12(b)(6), Fed.R.Civ.P., for an order dismissing Count IX for failure to state a claim upon which relief can be granted. The court finds that under the law of Connecticut, which governs this case, the theory of strict liability in tort does not extend so far as to include the claim of a building's user that the architect of the building is liable, without proof of negligence, as a consequence of his sale of allegedly "defective" designs to the persons who constructed the building. Accordingly, Furman's motion to dismiss Count IX of the complaint is granted.

### The Allegations of Count IX

■ For the purposes of a motion to dismiss for failure to state a claim, the well-pleaded factual allegations of the complaint are taken to be true. *See Miree v. DeKalb County*, 433 U.S. 25, 27 n.2, 97 S.Ct. 2490, 2492 n.2, 53 L.Ed.2d 557 (1977); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972). However, the court need not accept averments which are legal conclusions unsupported by the facts alleged elsewhere in the complaint. *See Mitchell v. Archibald & Kendall*, 573 F.2d 429, 432 (7th Cir. 1978); *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974); *Pauling v. McElroy*, 278 F.2d 252, 253–54 (D.C. Cir.) (per curiam), *cert. denied*, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); *Abruscato v. Local 199, Industrial Workers of Allied Trades*, 297 F.Supp. 481, 483 (S.D.N.Y.1969); 2A *Moore's Federal Practice* ¶ 12.08 at 2265–69 & n.4 (2d ed. 1979). The allegations relevant to this motion are summarized below.

According to K-Mart's complaint, Midcon and Furman entered into an agreement which required Furman to provide the "working drawings, plans and specifications" for the Manchester K-Mart store (Complaint, Count IX, ¶ 12). Furman is "engaged in the business of preparing working drawings, plans and specifications for buildings such as" that store. (*Id.* ¶ 15). K-Mart alleges that Furman's designs for the building were "defective, and unreasonably dangerous to the user of the building"; that "the building constructed in accordance with [Furman's] working drawings, plans and specifications was such that it would not withstand expected weather conditions"; and that "the roof of the building had a natural tendency to collapse." (*Id.* ¶ 14). Shortly after Furman completed his "working drawings, plans and specifications," defendants Midcon and Saker used them, "without substantial change as far as the design of the building is concerned," to construct the building. (*Id.* ¶ 16). In 1972, the K-Mart store "was completed substantially in accordance with [Furman's] working drawings, plans and specifications" (*Id.* ¶ 16). From 1972 to 1978, K-Mart operated a store in the building, where it kept a substantial amount of inventory, stock, trade fixtures, merchandise and personal property. (*Id.* ¶¶ 8–9). As a result of the defective designs prepared by Furman, two portions of the roof of the store collapsed during the period January 18–20, 1978, destroying K-Mart's property. (*Id.* ¶¶ 10, 18).

### Jurisdiction and Governing Law

 Federal jurisdiction over this action is founded upon diversity of citizenship, pursuant to 28 U.S.C. § 1332(a)(1).[1] Accordingly, this court must apply Connecticut conflict of laws rules to determine what law governs the case. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort actions, Connecticut courts follow the rule of *lex loci delicti*—i. e., "[t]he creation and extent of liability in tort are fixed by the law of the state in which the tort is committed." *Bissonnette v. Bissonnette*, 145 Conn. 733, 734, 142 A.2d 527, 528 (1958). *See also Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977).[2] Because, for choice of law purposes, Connecticut law deems a tort to have been committed in the state where the injury occurred, *Patch v. Stanley Works*, 448 F.2d 483, 491 (2d Cir. 1971); *Landers v. Landers*, 153 Conn. 303, 304–05, 216 A.2d 183, 184 (1966), the products liability law of Connecticut—the state in which the property damage is alleged to have occurred—controls, even if Furman prepared the allegedly defective designs in another state.

1. The plaintiffs allege that they are Michigan corporations with principal places of business in that state; that defendants Midcon and Saker are incorporated in Connecticut and New Jersey, respectively, with each having its principal place of business in its state of incorporation; and that Furman, a New York resident, practices his profession in that state. (Amendment to Complaint, Count IX, ¶ 19). These jurisdictional allegations have not been challenged.

2. The rule of *lex loci delicti* has long been criticized and, as the Connecticut Supreme Court noted in *Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977), has been abandoned by the highest courts of many states in favor of the principle of applying the law of the jurisdiction which has the "most significant relationship" with the controversy or which may be considered the "center of gravity." *See, e. g., Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 11–23, 203 A.2d 796, 801–06 (1964); *Babcock v. Jackson*, 12 N.Y.2d 473, 479–82, 240 N.Y.S.2d 743, 747–50, 191 N.E.2d 279, 281–84 (1963) (Fuld, J.); *Restatement (Second) of Conflict of Laws* § 145 (1971); Weintraub, *A Method for Solving Conflicts Problems—Torts*, 48 Cornell L.Q. 215 (1963). However, under *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this court is not free to apply the principle articulated in modern cases in other jurisdictions, rather than the rule still adhered to by the courts of the forum state. Nonetheless, in this case, the application of either approach would lead to the determination that the Connecticut law governs the respective rights of the parties. Connecticut is both the place of the plaintiff's injury and the state with the "most significant relationship to the occurrence and the parties." *Restatement (Second) of Conflict of Laws* § 145(1) (1971).

### Strict Tort Liability Under Connecticut Law

In cases involving personal injury or property damage allegedly caused by defective products, the Connecticut Supreme Court has consistently followed the rule of strict liability set forth in *Restatement (Second) of Torts* § 402A (1965). *See, e. g., Hoelter v. Mohawk Services, Inc.*, 170 Conn. 495, 500–01, 365 A.2d 1064, 1066 (1976); *Marko v. Stop & Shop, Inc.*, 169 Conn. 550, 553, 364 A.2d 217, 219 (1975); *Wachtel v. Rosol*, 159 Conn. 496, 499–500, 271 A.2d 84, 85–86 (1970); *Rossignol v. Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 559–60, 227 A.2d 418, 423 (1967); *Garthwait v. Burgio*, 153 Conn. 284, 289, 216 A.2d 189, 192 (1966).[3] The relevant section of the *Restatement* provides:

§ 402A. *Special Liability of Seller of Product for Physical Harm to User or Consumer*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

### The Inapplicability of the Strict Tort Liability Doctrine to the Facts Pleaded in Count IX

■ In support of this motion, Furman argues that he provided professional services, rather than "products," to Midcon, so that the doctrine of strict tort liability arising out of the sale of a defective "product" may not be applied to this case. *See Gibson v. Sonstrom*, 2 Conn.L.Trib.No. 103, p. 3 (Super.Ct.Hartford Cty. Nov. 3, 1976) (construction company which installed a driveway provided a service, not a "product"; plaintiff's personal injury claim against the company did not state a cause of action under strict tort liability theory). In opposition to the motion to dismiss Count IX, K-Mart, relying upon its allegation that Furman sold "working drawings, plans and specifications" for the K-Mart store, insists that this case concerns tangible "products" sold by an architect whose business is the sale of such products. *See Vincenzo v. Trus Wall Systems, Inc.*, 5 Conn.L.Trib.No. 34, p. 19 (Super.Ct.New Haven Cty. July 26, 1979) ("defective design" of wood trusses supporting a roof constituted a "product" for purposes of a strict tort liability claim).

Whether Furman provided Midcon with professional "services" or tangible "products" is an open question, both as a matter of semantics and as a matter of Connecticut tort law. Either term describes reasonably well what Midcon purchased from Furman, and, as the conflicting approaches in recent Superior Court cases show, it is not clear whether the law of this state would deem Furman to have sold "products," rather than "services," for the purposes of section 402A. *Compare Gibson v. Sonstrom, supra* (the "concept of product has not yet been sufficiently broadened to include work rendered under individually-tailored service

---

**3.** To the extent that it affects the substantive law of products liability, the Connecticut Product Liability Actions Act of 1979, Public Act 79–483, as amended by Public Act 79–631 (technical amendments), does not apply to this case. That statute became effective on October 1, 1979, pursuant to Conn.Gen.Stat. § 2–32, which provides that "[a]ll public acts, except

when otherwise therein specified, shall take effect on the first day of October following the session of the general assembly at which they are passed . . . ." The cause of action asserted by K-Mart in Count IX accrued no later than January 1978, and the complaint was filed on August 30, 1979.

and construction contracts") *with Vincenzo v. Trus Wall Systems, Inc., supra* ("[t]he definition of 'product' should not be so narrow as to exclude a design"). *See generally* Sales, *The Service-Sale Transaction: A Citadel Under Assault,* 10 St. Mary's L.J. 13 (1978); Note, *Products and the Professional: Strict Liability in the Sale-Service Hybrid Transaction,* 24 Hastings L.J. 111 (1972); Note, *The Application of Implied Warranties to Predominately "Service" Transactions,* 31 Ohio St.L.J. 580 (1970).

Although the semantical and legal questions raised by K-Mart's characterization of the Furman-Midcon transaction as a sale of "products" within the meaning of section 402A are interesting, they need not be resolved here, for the court finds that the allegations of Count IX are legally deficient in another regard.[4] Even assuming *arguendo* that Furman sold "working drawings, plans and specifications" for the K-Mart store, and that these are "products," the complaint lacks allegations of fact which support the proposition—essential to a claim for tort liability under section 402A— that the products sold by Furman to Midcon were expected to, and did in fact, "reach the user or consumer [*i. e.,* K-Mart] without substantial change in the condition in which [they were] sold." *Restatement (Second) of Torts* § 402A(1)(b) (1965).

K-Mart has alleged that the "working drawings, plans and specifications" prepared by Furman were provided to defendants Midcon and Saker so that they could construct a building from those designs, and that Midcon and Saker made such use of Furman's work product. (Complaint, Count IX, ¶ 16). K-Mart has further alleged that the building in question was, as intended, leased to K-Mart for use as a retail store. (*Id.* ¶¶ 5–8). Although these factual allegations support K-Mart's conclusion that the plaintiffs "were among the ultimate users of the building" (*Id.* ¶ 17), they provide no

basis for the conclusory allegation that the plaintiffs were "accordingly among the ultimate users of the working drawings, plans and specifications" (*Id.*).[5] To the contrary, the factual allegations of the complaint indicate only that the building owner (Midcon) and the general contractor (Saker) were the intended and actual recipients and users of the "working drawings, plans and specifications" prepared by Furman, and that K-Mart was an intended and actual user of the building constructed by Midcon and Saker from Furman's designs.

Since K-Mart is not alleged to have directly received or made use of Furman's "working drawings, plans and specifications," it may only be deemed a "user" or "consumer" of Furman's "products" after they had been transformed by Midcon, Saker and their agents from designs drawn on paper into a large building suitable for K-Mart's business. Accordingly, from the averments in K-Mart's complaint, even if Furman's designs are "products," K-Mart used them, if at all, only after they had undergone "substantial change in the condition in which [they were] sold" by Furman. Count IX of the complaint therefore states no cause of action under the theory of section 402A, as it has been applied by the Supreme Court of Connecticut. *See Guglielmo v. Klausner Supply Co.,* 158 Conn. 308, 316, 259 A.2d 608, 612 (1969) ("For a plaintiff to prevail in [a strict tort liability] cause of action it is incumbent upon him to allege and prove . . . that the product was expected to and did reach the user or consumer without substantial change in the condition in which it was sold"); *Rossignol v. Danbury School of Aeronautics, Inc., supra,* 154 Conn. at 562, 227 A.2d at 424 (1967).

Although the Supreme Court of Connecticut has treated the "without substantial change" requirement as essential to the maintenance of an action under the theory

4. The court accordingly has no occasion to consider whether *Gibson* or *Vincenzo* represents the better view of the proper definition of "product" under Connecticut law.

5. As previously noted, although a court must accept the well-pleaded factual allegations of a complaint for purposes of a motion to dismiss, it need not give credence to those allegations which are mere conclusions of law lacking support in the facts alleged. See p. 814, *supra.*

of section 402A, the authors of the *Restatement* left open the possibility that strict tort liability might, in appropriate cases, be extended beyond the limits of that section, to situations involving products which had undergone substantial alteration before reaching the ultimate consumer or user. *See* Comment p, *Restatement (Second) of Torts* § 402A (1965).[6] The court therefore proceeds to review the theories underlying the rule of strict tort liability for the purpose of determining whether it would be appropriate to extend the doctrine to the facts alleged in Count IX of K-Mart's complaint.

The official comments to *Restatement (Second) of Torts* § 402A establish that the doctrine of strict tort liability was principally intended to impose a special liability on those who market defective products to the general public in a mass-distribution context:

"[T]he justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility to any member of the consuming public who may be injured by it . . . and that the consumer of such products is entitled to the maximum of protection at the hands of . . . those who market the product."

Comment c, *Restatement (Second) of Torts* § 402A (1965).

"The basis for the rule here stated is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods . . . ."

Comment f, *Restatement (Second) of Torts* § 402A (1965). Similar explanations for the rule may be found in leading cases in other jurisdictions. *See, e. g., Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 64–65, 207 A.2d 305, 311 (1965) ("when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use"); *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 64, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1962) (Traynor, J.) ("[i]mplicit in the machine's presence on the market . . . was a representation that it would safely do the jobs for which it was built"); *see also Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 384, 161 A.2d 69, 83–84 (1960).

It is possible that the doctrine of strict tort liability will be extended to reach the design and development of buildings which, like ordinary consumer products, are mass marketed to the public.[7] *Cf. Schipper v.*

**6.** Comment p provides, in pertinent part:
"Thus far the decisions applying the rule stated have not gone beyond products which are sold in the condition, or in substantially the same condition, in which they are expected to reach the hands of the ultimate user or consumer. In the absence of decisions providing a clue to the rules which are likely to develop, the [American Law] Institute has refrained from taking any position as to the possible liability of the sellers where the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands and before it reaches those of the ultimate user or consumer.
It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section . . . . The question is essentially one of whether the

responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which responsibility will be shifted, the others in which it will not. The existing decisions as yet throw no light upon the questions, and the Institute therefore expresses neither approval nor disapproval of the seller's strict liability in such a case."
*See also* Caveat (2) to *Restatement (Second) of Torts* § 402A (1965).

**7.** As plaintiffs' counsel has conceded, this case involves nothing akin to mass production or mass marketing. Transcript of Oral Argument, pp. 33–34. Rather, at issue here is a single set of plans and specifications, prepared by an individual licensed as an architect, for a single building.

*Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965). However, the basic rationale of section 402A does not support the proposition, advanced by K-Mart, that a user of a building may recover for property damages allegedly caused by defective architectural designs for that building where it is not even alleged that the architect's conduct was analogous to the manufacture or marketing of consumer products intended for widespread distribution. This conclusion is consistent with a growing body of case law in other jurisdictions. *See, e. g., City of Mounds View v. Walijarvi*, 263 N.W.2d 420, 423–25 (Minn.1978) (strict liability in tort not applicable to claim against an architect by his client); *Sears, Roebuck & Co. v. Enco Associates, Inc.*, 43 N.Y.2d 389, 398, 401 N.Y.S.2d 767, 772, 372 N.E.2d 555, 559 (1977) (same); *Van Ornum v. Otter Tail Power Co.*, 210 N.W.2d 188, 201 (N.D.1973); *Queensbury Union Free School District v. Jim Walter Corp.*, 91 Misc.2d 804, 398 N.Y. S.2d 832 (Sup.Ct. Warren Cty. 1977) (architect who allegedly designed defective roof not liable under strict tort liability theory, since "the cause of action is available against those engaged in the manufacture, distribution or sale of the offending product—those responsible for placing the defective product in the marketplace"); *cf. La Rossa v. Scientific Design Co.*, 402 F.2d 937, 942–43 (3d Cir. 1968) (under New Jersey law, no strict tort liability for designing or "engineering" a plant, because no mass production or distribution of goods was involved); *Stuart v. Crestview Mutual Water Co.*, 34 Cal.App.3d 802, 811–12, 110 Cal. Rptr. 543, 549–50 (1973) (engineers not strictly liable in tort on theory that they designed defective structure, for "[they] are in no sense analogous to manufacturers who place products on the market"); *Board of Trustees v. Kennerly, Slomanson & Smith*, 167 N.J.Super. 311, 400 A.2d 850 (Law Div. 1979).

Although the court concludes that Count IX of K-Mart's complaint fails to state a claim upon which relief may be granted, K-Mart is not without a remedy for any negligence in the architect's design, for this decision in no way affects the viability of the negligence claim asserted against Furman in Count VIII of the complaint. Indeed, the ability of K-Mart to isolate the architect as a possible source of negligence distinguishes this case from the typical strict tort liability cases involving defective products. An injured consumer's need to overcome the practical obstacles to identifying the possible wrongdoers in a mass-production, mass-distribution context is a rationale advanced in support of the strict liability doctrine:

> "The disparity in position and bargaining power which forces the consumer to depend entirely on the manufacturer and the difficulty of requiring the injured party in consumer products cases to trace back along the channel of trade to the source of production in the search for the origin of the defect in order to prove negligence have been among the reasons for the emergence of the doctrine of strict liability in tort."

*La Rossa v. Scientific Design Co., supra*, 402 F.2d at 942.

This rationale is not applicable to the instant case. The court has been given no basis to find that any "disparity in position and bargaining power" favors Furman, rather than K-Mart. In this context, it would be inappropriate to extend the doctrine of strict tort liability and dispense with the requirement that K-Mart plead and ultimately prove Furman's negligence. *See La Rossa v. Scientific Design Co., supra*, 402 F.2d at 942; Note, *Liability of Design Professionals—The Necessity of Fault*, 58 Iowa L.Rev. 1221, 1244 (1973).[8]

**8.** Another rationale sometimes offered in support of strict tort liability is that manufacturers or sellers of consumer products are better able than injured consumers or other parties to distribute the risks of injury to persons or property. *See Escola v. Cola Cola Bottling Co.*, 24 Cal.2d 453, 463, 150 P.2d 436, 441 (1944) (Tray-

nor, J., concurring); Comment, *Torts—Products Liability*, 86 Harv.L.Rev. 923, 926 (1973). *But see* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn.L.Rev. 791, 800 (1966) (risk distribution theory "appears to play only the part of a makeweight argument"). Even if this argument might be persuasive in

### Conclusion

For the reasons stated herein, the court finds that the facts alleged in Count IX of the complaint are insufficient to state a cause of action for strict liability in tort under Connecticut law and that the policies which justify the doctrine of strict liability are inapplicable to K-Mart's claim against Furman. Furman's motion to dismiss Count IX of the complaint is therefore granted.

It is so ordered.

some contexts, it is inapplicable here. Nothing in the record indicates that architects are better able than building owners, construction contractors or lessees of commercial buildings to bear and spread the costs of injuries to persons and property. *See* Note, *Liability of Design Professionals—The Necessity of Fault*, 58 Iowa L.Rev. 1221, 1244–45 (1973).