Peter C. **HALSTEAD**, Administrator, Plaintiff,

v.

**UNITED STATES** of America, Jeppesen & Co. and Katherine H. Saloomey, Administratrix, Defendants.

Katherine H. **SALOOMEY**, Administratrix, Plaintiff,

v.

**JEPPESEN & CO.**, Defendant.

Katherine H. **SALOOMEY**, Administratrix, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

Civ. Nos. B 77–270, B 77–274 and B 77–303.

United States District Court, D. Connecticut.

March 10, 1982.

---

784

James M. Kearns, Bridgeport, Conn., for plaintiff Halstead.

Robert Marzik, Stratford, Conn., for plaintiff Saloomey.

Raymond Beckwith, Suzanne Baldasare, Bridgeport, Conn., Floyd Dodson, for defendant Jeppesen.

James P. Piper, Washington, D. C., for Government.

Thomas H. Cotter, Bridgeport, Conn., for defendant Saloomey.

## OPINION RESPECTING APPLICABLE LAW

EGINTON, District Judge.

These wrongful death actions arose out of the tragic crash of a small private plane, a Beech Sierra, into a mountain ridge near Martinsburg, West Virginia on August 31, 1975. Killed were the pilot of the plane, Willard Vernon Wahlund, his father, and his young son Erik. They are survived by Willard's wife Penny and their minor daughter.

Plaintiffs Katherine H. Saloomey and Peter C. Halstead are the administratrix and administrator of Willard's and Erik's respective estates. Plaintiff Saloomey alleges that the accident resulted from the negligence of federal air traffic controllers operating out of Dulles Airport in Virginia and from a defect in a navigational chart manufactured in Colorado by defendant Jeppesen

& Co. (hereinafter "Jeppesen"). Jeppesen is incorporated in Colorado and has its principal place of business there. The maps were purchased from Jeppesen in Colorado by Wahlund's employer, Braniff Airlines, and were carried by him on the pilot's last trip. Plaintiff Halstead's complaint contends that the deaths were caused by the negligence of the controllers, by a defect in the Jeppesen navigational chart, and by the negligence of the pilot, Erik's father.

Both complaints involving Jeppesen set forth counts of negligence, breach of warranty and strict products liability. Jeppesen asserts that all three counts should be governed by the law of West Virginia, the site of the crash. At the time of the crash, August 31, 1975, the West Virginia Wrongful Death Act imposed a fixed monetary limit on recoverable damages. W.Va.Code § 55–7–6 (1965).[1] In 1976 this section was rewritten without any limitation, but the new version does not apply to deaths occurring prior to July 1, 1976. W.Va.Code § 55–7–6 (1976). Under the 1965 statute the distributees of the decedents were permitted to recover $10,000 for the wrongful death itself, $100,000 for financial and pecuniary losses sustained by the dependent distributees of the deceased, and special damages for funeral and medical expenses.

West Virginia law would thus limit plaintiff Saloomey's recovery to $110,000 plus funeral expenses. Plaintiff Halstead could recover no more than $10,000 plus funeral expenses, unless evidence of some financial or pecuniary loss sustained by any distributee of the unemancipated minor Erik Wahlund were introduced. *Bond v. Huntington,* 276 S.E.2d 539 (W.Va.1981); *Salerno v. Manchin,* 213 S.E.2d 805 (W.Va.1974); *Adams v. Sparacio,* 156 W.Va. 678, 196 S.E.2d 647 (1973). Finally, because West Virginia did not permit actions in strict products liability until 1979, *Morningstar v. Black and Decker Manufacturing Co.,* 253 S.E.2d 666 (W.Va.1979) plaintiffs could recover only on negligence and breach of warranty counts under West Virginia law.

■ Plaintiffs assert that the law of the forum state, Connecticut, rather than that of West Virginia is more appropriate for the court to apply in the instant suit, since the estates involved herein are of individuals resident in Connecticut at death. In Connecticut, the measure of recovery in a wrongful death action is the value to the decedent of his life rather than the monetary loss to his next of kin or estate. Conn. Gen.Stat. § 52–555;[2] *Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384 (2d Cir. 1975).

1. West Virginia Code § 55–7–6 (1965) provided in relevant part:

Every such action shall be brought by and in the name of the personal representative of such deceased person, and the amount recovered in every such action shall be recovered by said personal representative and be distributed in accordance herewith. In every such action the jury may award such damages as they deem fair and just, not exceeding ten thousand dollars, and the amount recovered shall be distributed to the parties and in the proportion provided by law for the distribution of personal estate left by persons dying intestate. In addition, the jury may award such further damages, not exceeding the sum of one hundred thousand dollars, as shall equal the financial or pecuniary loss sustained by the dependent distributee or distributees of such deceased person, and shall be distributed as though part of the decedent's estate to decedent's dependent distributees in the proportions provided by the laws of descent and distribution.

In every such action and in addition to the damages awarded pursuant to the foregoing provisions hereof, the personal representative

of the deceased shall be entitled to recover the reasonable funeral expenses of such deceased person and the reasonable hospital, medical and other expenses incurred as a result of the wrongful act, neglect or default of the defendant or defendants which resulted in death.

2. Conn.Gen.Stat. § 52–555 provides that:

In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, provided no action shall be brought to recover such damages and disbursements but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of.

The value to decedent of his life includes his lost earning capacity less income taxes and personal living expenses, plus the value of his capacity to carry on life's nonremunerative activities in a way he would have done had he lived.

■ Defendant vigorously opposes the application of Connecticut law and contends that if the court determines that West Virginia law is not applicable, then the Wrongful Death Act of Colorado rather than that of Connecticut should govern the claims of both plaintiffs. Colorado law permits recovery in a wrongful death action to the extent of the survivors' pecuniary losses. *Pierce v. Conners*, 20 Colo. 178, 37 P. 721 (1894). However, if a deceased is not survived by a widow, widower or minor children, or a dependent mother or father, then damages recoverable are limited to $45,000. Colo.Rev.Stat. § 13–21–203.[3] In all cases, the Act excludes any award of exemplary or punitive damages. *Mangus v. Miller*, 35 Colo.App. 335, 535 P.2d 219 *cert. dismissed*, 189 Colo. 481, 569 P.2d 1390 (1975).

Both Colorado and Connecticut, unlike West Virginia as of the date of the crash, recognize actions in strict products liability as defined by § 402A of the Restatement (Second) of Torts (1965).[4] *Rossignol v. Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 227 A.2d 418 (1967); *Garthwait v. Burgio*, 153 Conn. 284, 216 A.2d 189 (1965); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975); *Bradford v. Bendix-Westinghouse Auto Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973). However, Jeppesen argues that even if the law of Colorado or Connecticut rather than that of West Virginia applies, plaintiffs may not maintain an action in strict products liability because the Jeppesen navigational chart is a service and not a product.

## CHOICE OF LAW FOR STRICT LIABILITY AND NEGLIGENCE COUNTS

■ Since jurisdiction is premised on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a)(1), this court must apply Connecticut conflict of law rules to determine what law governs the case. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The counts of negligence and strict products liability clearly sound in tort. In such actions the Connecticut courts have traditionally followed the rule of *lex loci delicti*: the law of the state where the tort was committed governs the substantive elements of the cause of action. *Gibson v. Fullin*, 172 Conn. 407, 374 A.2d 1061 (1977); *Landers v. Landers*, 153 Conn. 303, 216 A.2d 183 (1966). Defendant urges that because Connecticut deems a tort to have been committed in the state where the injury occurred, *Patch v. Stanley Works*, 448 F.2d 483, 491 (2d Cir. 1971); *Landers v. Landers, supra*, the negligence law of West Virginia, the state in

---

**3.** Colo.Rev.Stat. § 13–21–203 provides in relevant part that:

All damages accruing under section 13–21–202 shall be sued for and recovered by the same parties and in the same manner as provided in section 13–21–201, and in every such action the jury may give such damages as they may deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue; and also having regard to the mitigating or aggravating circumstances attending any such wrongful act, neglect or default; except that if the decedent left neither a widow, widower, nor minor children, nor a dependent father or mother, the damages recoverable in any such action shall not exceed forty-five thousand dollars.

**4.** Section 402A of the Restatement (Second) of Torts (1965) provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his proper property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

which the wrongful death is alleged to have occurred, controls even though Jeppesen prepared the allegedly defective design in Colorado.

The conflicts rule of *lex loci delicti* has been severely criticized by courts and commentators alike and has been abandoned by the highest courts of many states in favor of the principle of applying the law of the jurisdiction which has the most significant relationship to the controversy or which may be considered the "center of gravity." Restatement (Second) of Conflict of Laws § 145 (1971)[5] (Comment Subsection 2); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y. S.2d 743, 191 N.E.2d 279 (1963); *Griffith v. United Airlines*, 416 Pa. 1, 203 A.2d 796 (1964); *Dworak v. Olson Construction Co.*, 191 Colo. 161, 551 P.2d 198 (1976); *Clark v. Clark*, 107 N.H. 351, 222 A.2d 205 (1966).

The Connecticut Supreme Court, in its recent application of *lex loci delicti* in *Gibson v. Fullin, supra*, recognized the growing acceptance in other jurisdictions of the most significant relationship test of § 145 of the Restatement, but declined to follow the trend, absent more compelling circumstances than were presented in that case. " . . . [T]he developing rule is still very much in a transitional stage, and the present case presents no compelling reason to abandon the traditional rule." 172 Conn. at 411. From this language, it appears that the Supreme Court would abandon *lex loci delicti* in favor of the Restatement Second rule in appropriate circumstances.

Judge Burns, in *Defourneaux v. Sturm, Ruger & Co.*, 503 F.Supp. 2 (D.Conn.1980), suggested in dictum that in a case where neither party had any meaningful relationship with the state whose law would govern under the old rule, Connecticut would apply the new approach. 503 F.Supp. at 4. The instant case presents just such a fact situation. Plaintiffs' decedents were citizens and domiciliaries of Connecticut and defendant Jeppesen is a Colorado corporation with its principal place of business in Colorado. The navigational charts which are the subject of the negligence and strict products liability claims were manufactured and distributed in Colorado. The complaints in this action do not allege any acts of negligence on the part of Jeppesen in West Virginia.

In the absence of any meaningful contact between the litigation and the state of West Virginia other than, by pure fortuity, the site of the crash, it would be offensive to traditional notions of justice and normal expectations to apply West Virginia law to adjudicate plaintiffs' wrongful death claims. West Virginia law, if applied, would preclude plaintiffs' actions in strict products liability and would limit damages recoverable by Saloomey and Halstead to $110,000 and $10,000 respectively, regardless of the actual pecuniary losses suffered by decedents' distributees. To thus limit the rights of nonresidents of West Virginia by applying restrictions which West Virginia has itself subsequently eliminated would appear arbitrary, inequitable and without rational justification.

5. Section 145 of the Restatement (Second) of Conflict of Laws (1971) provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The Restatement Commentators suggest that the more important factors to be weighed in a tort action are (1) relevant policies of the forum state (2) relevant policies of other interested states and the relative interest of those states in determining the particular issue and (3) ease in determination and application of the law to be applied. Comment b, Restatement (Second) of Conflict of Laws § 145 (1971).

Thus it is the conviction of this court that the Supreme Court of Connecticut, if faced with the fact situation in the instant suit, would, pursuant to its holding in *Gibson*, abandon the rule of *lex loci delicti* in favor of the most significant relationship test of § 145 of the Restatement Second. The following analysis proceeds along the lines suggested by the Restatement.

■ Although the deaths occurred in West Virginia, we have previously noted that the conduct of allegedly tortious substandard design and manufacture occurred in Colorado. Jeppesen is incorporated in Colorado and the navigational chart was delivered to Braniff in Colorado enclosed in an envelope addressed to Captain Wahlund. Colorado obviously has far more significant contact points than West Virginia applicable to this litigation.

From the public policy standpoint, Colorado's legislature, by formulating laws which permit counts of strict products liability and negligence in wrongful death actions with very limited restrictions on damages, evidenced at least three aims: First, that survivors of a deceased in a wrongful death action should be compensated at a minimum for their pecuniary losses; second, that the wrongdoer should bear that cost, particularly where the wrongdoer is a manufacturer presumably able to spread the social cost of the product among those who consume it and thereby benefit from it; and third, that other manufacturers might be deterred from similar wrongdoing. For this court to apply the since rescinded, restrictive laws of West Virginia would be in obvious derogation of those public policies evidenced by the laws of Colorado. However, the court cannot ignore the public policies evidenced by the laws of West Virginia, and must balance those with Colorado before reaching a decision.

Examining the public policy aspect from the viewpoint of West Virginia, we note that the tortious conduct occurred elsewhere. Accordingly, West Virginia is presumably unconcerned with the standards or damage limitations to be applied to that conduct. At one time the West Virginia legislature had apparently sought to avoid the imposition of excessive financial burdens on West Virginia defendants, a primarily local concern. There is no reason to extend the benefit of West Virginia's outmoded restrictions to a manufacturer whose principal place of business is in a state having no similar legislative limitations. In the instant suit, defendant Jeppesen would have secured insurance or accepted the role of self-insurer without any limit in mind and cannot reasonably complain if compensatory damages are assessed in accordance with the law of its state of incorporation, Colorado, and if plaintiffs receive no more than they would have if decedents had been injured at home in Connecticut. This court therefore finds that, as between Colorado and West Virginia, Colorado's is the proper law to apply to the instant litigation under the most significant relationship test of § 145 of the Restatement (Second) of Conflict of Laws.

As between Colorado and Connecticut on the question of the existence of an action in strict products liability, there is no conflict: both states recognize that theory of recovery. On the question of the measure of recovery, the damages provision of Colorado is somewhat more restrictive than that of Connecticut. The distinction is not without significance, because Connecticut obviously has a strong interest in compensating survivors in a wrongful death action for their pecuniary losses, since failure to provide adequate compensation could mean that the plaintiffs would become burdens of the state. *Turcotte v. Ford Motor Co.*, 494 F.2d 173, 177, 178 (1st Cir. 1974); *In re Air Crash Disaster at Boston, Mass.*, 399 F.Supp. 1106, 1112 (D.Mass.1975).

Willard Vernon Wahlund's survivors are a widow and minor daughter. Under Colorado law these survivors are able to recoup their losses completely, unlimited by any arbitrary dollar figure. Although the survivors of Erik Wahlund are limited by statute to $45,000, it is reasonable to assume this amount to be sufficient to compensate the pecuniary losses of the distributees of the six year old boy. Insofar as damages

awarded under Connecticut law might exceed the actual losses of the survivors, Connecticut should have little interest in assessing such damages to penalize a foreign corporation whose wrongful conduct occurred elsewhere. Accordingly, Connecticut's legitimate interests are adequately served in this instance by imposing Colorado's Wrongful Death Act.

Colorado has a strong interest in protecting entities within its borders from liability greater than the pecuniary losses suffered by a decedent's distributees. Colorado, "as does every state, has a substantial interest in the economic health of corporations which do business within its borders. It derives substantial sales and income taxes, as well as other revenues, directly and indirectly from a corporation's activities within the state." *In re Air Crash Disaster Near Chicago, Ill.*, 644 F.2d 594, 614 (7th Cir. 1981). Colorado's rule limiting liability to the pecuniary losses of the survivors in a wrongful death action enhances the financial well-being of its corporations, which in turn enhances the financial well-being of the state.

█ Colorado's numerous contacts with the litigation, its interest in the financial integrity of its corporations, and the fact that application of its Wrongful Death Act will still permit the parties to recover their pecuniary losses mandate the application of the law of Colorado rather than that of Connecticut to plaintiffs' counts of negligence and strict products liability.

## THE NATURE OF THE JEPPESEN NAVIGATIONAL CHART

Defendant, in an effort to avoid the plaintiffs' strict liability counts, argues that even if Colorado law permits actions in strict products liability, Jeppesen provides "professional services" rather than products to Braniff, so that the doctrine of strict tort liability arising out of the sale of a defective product cannot be applied to this case.

Jeppesen, as a publisher of navigational charts, gathers information from the United States Government and graphically displays that information on charts which are sold to the aviation public, including commercial airlines. Jeppesen contends that the essence of its transaction with Braniff, the conveyance of information, constituted a service rather than a product and that the paper the map was printed on was merely the method by which the information was conveyed to subscribers.

Jeppesen relies on cases involving the services of physicians to individual patients and on cases involving the individualized plans of architects and engineers for particular clients. *See e.g., LaRossa v. Scientific Design Co.*, 402 F.2d 937 (3rd Cir. 1968); *Laukkanen v. Jewel Tea Co.*, 78 Ill.App.2d 153, 222 N.E.2d 584 (1966); *Sears, Roebuck and Co. v. Enco Associates, Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 772, 372 N.E.2d 555, 559 (1977).

Plaintiffs claim that this case concerns a tangible product sold by a corporation whose business is the mass manufacture and distribution of thousands of such products. As such, Jeppesen is not a member of a recognized profession such as a doctor, architect or engineer, nor did Jeppesen provide Braniff with any specialized service. Plaintiffs urge this court to follow a recent decision of the Ninth Circuit in *Aetna Casualty and Surety Co. v. Jeppesen & Co.*, 642 F.2d 339 (9th Cir. 1981) wherein the court simply assumed that the Jeppesen charts were products and subjected them to strict products liability in a wrongful death action arising out of a plane crash involving a defective Jeppesen map.

This court will not make any automatic or sweeping classification. Whether a transaction involving the sale of a map constitutes the rendition of a professional service or the sale of a tangible product poses a difficult question of semantics since there is an element of service in all "goods" whether maps or consumer durables. All require some skilled service in initial design as well as in the transformation of raw materials into finished product.

The determination of whether the "service" or "product" element predominates a given transaction is an elusive question un-

der both Colorado and Connecticut case law. *Compare St. Luke's Hospital v. Schmaltz,* 188 Colo. 353, 534 P.2d 781 (1975) (Hospital which furnished defective blood for transfusion to a patient who contracted serum hepatitis as a result thereof did not make a sale of a product, but rendered a service. Strict products liability count could not be maintained.) *with Belle Bonfils Memorial Blood Bank v. Hansen,* 195 Colo. 529, 579 P.2d 1158 (1978) (Actions of blood bank in providing blood to a hospital for transfusion into a patient constituted a sale and involved a product, so that when the patient contracted serum hepatitis, she could maintain an action against the blood bank for strict products liability and breach of implied warranty.) *Compare also, Gibson v. Sonstrom,* 2 Conn.Law Trib. No. 103, p.3 (Super.Ct. Hartford Cty. Nov. 3, 1976) *with Vincenzo v. Trus Wall Systems, Inc.,* 5 Conn. Law Trib. No. 34, p. 19 (Super.Ct. New Haven Cty. July 26, 1979).

However, regardless of the relative plausibility of the parties' divergent classifications of a map, in this instance, the classification of the Jeppesen charts as products appears to conform to the rationale of § 402A and is consistent with the developing case law under that section.

Plaintiffs cited two cases which held that maps and plats produced by draftsmen are goods within the meaning of the Fair Labor Standards Act: *Wirtz v. A.S. Giometti & Assoc., Inc., et al.,* 399 F.2d 738 (5th Cir. 1968) and *Schultz v. Merriman,* 303 F.Supp. 1174 (D.N.H.1969), *mod. on other grounds,* 425 F.2d 228 (1st Cir. 1970). Because the courts in both cases were dealing with the question of whether the maps were goods for the purpose of a somewhat esoteric statute, rather than § 402A of the Restatement Second, they do not constitute direct support for the plaintiffs' position. However, the language and holdings of those cases is consonant with the view urged by the plaintiffs.

In *Wirtz,* the court held that plats and maps prepared by draftsmen were "goods" within the meaning of the Act. The employer's business involved the preparation of maps and plats to assist attorneys, banks and real estate interests in ascertaining exact boundary lines of property. The court noted that the paper on which the information was printed was a "thing." The court further noted that the paper was changed "from an unrevealing blank piece of paper to one which is not only a 'thing' but a thing on which something else has been added," namely, "(a) the artistic-engineering concept of the scrivener-artist-draftsman, and (b) the lines, squares, angles, curves making up the drawing plus the physical ingredients of India ink or other mediums in which they are sketched." 399 F.2d at 739. Regarding the employer's contention that the maps and plats were nothing more than physical embodiments of professional conclusions concerning title, area, ownership, etc., and therefore did not come within the definition of "goods", the court said that "an Act meant to operate directly in the very practical matter of hourly, daily, and weekly pay of non-owner wage-earners cannot tolerate such metaphysical dialectic as the basis for its application." Ibid.

In *Schultz,* which presented a similar fact situation, Judge Bownes found "no difficulty in rejecting the defendant's contention that plans and maps are nothing more than physical embodiments of professional conclusions and advice." He held "that the plans produced by Mr. Merriman are 'goods' and are the subject of barter and sale, and come within the scope of the 'goods' definition of the Act. See *Wirtz v. A.S. Giometti & Associates, Inc.,* 399 F.2d 738 (5th Cir. 1968)." 303 F.Supp. at 1177.

On appeal, the First Circuit, although modifying the district court opinion in some respects, affirmed its holding that the maps were goods, stating that "plans are not merely embodiments of intangible professional advice, but are ultimate physical products, capable of multiple uses. They do not fail to meet the ordinary concept of goods simply because a substantial amount of professional skill preceded or entered into their composition." *Schultz v. Merriman,* 425 F.2d 228, 229 (1st Cir. 1970).

By the same token, the fact that some professional skill entered into the manufacture of the Jeppesen chart should not preclude subjecting Jeppesen to strict products liability. Given that Jeppesen *mass produced* and distributed its charts, its activity comes within the scope of the rationale of § 402A and should not be insulated from a strict standard of liability by virtue of metaphysical and semantic quibbling.

This court finds most instructive on this point Judge Cabranes' exhaustive consideration of the issue in *K-Mart et al. v. Midcon Realty Group of Conn., et al.*, 489 F.Supp. 813 (D.Conn.1980). In *K-Mart*, the defendant, an architect, agreed to provide drawings, plans and specifications for a building rented by K-Mart for one of its retail stores. As a result of defective designs prepared by the defendant, two portions of the roof collapsed. Charging that the designs for the building were defective and unreasonably dangerous, K-Mart argued that the defendant should be subject to strict products liability.

Judge Cabranes did not determine whether the design was a product, because he held that the plaintiff's cause of action failed to meet an independent requirement of § 402A; the design had not reached the ultimate consumer, K-Mart, substantially unchanged. However, he then discussed the theories underlying the rule of strict liability and concluded that the rationale of § 402A would not support imposing strict products liability on the defendant architect in any case.

"The official comments to Restatement (Second) of Torts § 402A establish that the doctrine of strict tort liability was principally intended to impose a special liability on those who market defective products to the general public in a mass-distribution context." 489 F.Supp. at 818; See Comments c and f of the Restatement (Second) of Torts § 402A (1965). Given this rationale, Judge Cabranes reasoned that in situations where a professional renders *individualized* services, such as an architect who designs a *single* set of plans and specifications for a single building, the imposition of strict products liability would clearly be inappropriate. He cited *LaRossa v. Scientific Design Co., supra*, 402 F.2d at 942–43 (under New Jersey law no strict tort liability for designing or engineering a plant, because no mass production or distribution of goods was involved) and *Stuart v. Crestview Mutual Water Co.*, 34 Cal.App.3d 802, 811–12, 110 Cal.Rptr. 543, 549–50 (1973) (engineers not strictly liable in tort on the theory that they designed defective structure for "[they] are in no sense analogous to manufacturers who place products on the market.") 489 F.Supp. at 819.

However, as Judge Cabranes reasoned, the rationale of § 402A, revealed by the official comments noted above, would arguably support extending strict products liability to reach the "design and development of buildings which, like ordinary consumer products, are mass marketed to the public." 489 F.Supp. at 818. The fact that a customer purchases a plan, design or map to obtain the information contained therein does not render the essence of the transaction a service outside the ambit of § 402A. If suitable for mass marketing, the information is in some sense a fungible good for which the manufacturer placing it on the market must assume responsibility.

This court concurs with Judge Cabranes' view of § 402A, and finds that in the instant suit Jeppesen did not design a navigational chart for a particular individual. Rather, Jeppesen mass produced and distributed thousands of charts on the aviation market. Implicit in their presence on the market was the representation that the purchaser could rely on their information safely. Exposing defendant Jeppesen's conduct to strict products liability is thus entirely appropriate. Hence, this court finds that the Jeppesen navigational charts are products for the purposes of § 402A of the Restatement (Second) of Torts (1965).

## CHOICE OF LAW: BREACH OF EXPRESS AND IMPLIED WARRANTY

Plaintiffs' claims against Jeppesen based upon breach of express and implied warran-

ty are contractual in nature.[6] Prior to the adoption of the Uniform Commercial Code (hereinafter the U.C.C.) by the Connecticut legislature, in a contract action for breach of warranty, the law of West Virginia probably would have applied. The state where the contract was made governed the question of the existence of the warranty and the persons to whom it applied unless the contract was intended to have its beneficial operation elsewhere. *McQuaide v. Bridgeport Brass Co.*, 190 F.Supp. 252, 254 (D.Conn.1960); *Craig & Co. v. Uncas Paperboard Co.*, 104 Conn. 559, 133 A. 673 (1926). West Virginia appears to be the jurisdiction where the maps were to have their beneficial operation and effect, and if so, the pre-U.C.C. conflicts rule would dictate the application of West Virginia rather than Colorado law, notwithstanding the fact that Braniff purchased the navigational charts from Jeppesen in Colorado. Defendant thus urges that the West Virginia Wrongful Death Act should apply to plaintiffs' breach of warranty counts.

However, defendant has overlooked § 42a–1–105 of the U.C.C., adopted by the Connecticut legislature in 1962, which displaced the old contracts conflicts rule. § 42a–1–105(1) provides:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this title applies to transactions bearing an appropriate relation to this state.

C.G.S.A. § 42a–1–105.

The official comment to the U.C.C. in Connecticut, refers to a transaction's "significant contacts" as being factors in the choice of law.

> Where a transaction has significant contacts with a state which has enacted the Act and also with other jurisdictions, the question [of] what relationship is "appropriate" is left to judicial decision.

C.G.S.A. § 42a–1–105 Official Code Comment, para. 3.

The Supreme Court of Connecticut has yet to comment on the impact of the Uniform Commercial Code on the old Connecticut conflicts rule. However, courts in other jurisdictions have interpreted § 1–105 of the U.C.C. as requiring the use of an "appropriate relations" test equivalent to the significant contacts test of the Restatement (Second) of Conflicts of Law, § 188 (1971).[7]

---

**6.** Actually, there are two bases of recovery on an implied warranty theory under Connecticut law. *Pais v. Logemann Bros. Co.*, 5 Conn. Law Trib. No. 47 (Superior Court Waterbury 1979); *Quadrini v. Sikorsky Aircraft Division*, 505 F.Supp. 1049 (D.Conn.1981). "One basis is contractual and statutory, involving either an implied warranty of merchantability or an implied warranty fitness for a particular purpose. Conn.Gen.Stat.Rev. §§ 42a–2–314, 42a–2–315. The other basis is in tort; a common law action against arising from the decision in *Hamon v. Digliani*, 148 Conn. 710, 174 A.2d 294 (1961)" 5 Conn. Law Trib. No. 47 at 16.

There do not appear to be any Connecticut choice of law cases definitively characterizing an action for breach of warranty as sounding in tort or contract. *Begley v. Ford Motor Co.*, 476 F.2d 1276 (2d Cir. 1973) *McQuaide v. Bridgeport Brass Co.*, 190 F.Supp. 252 (D.Conn.1960). Fortunately, this court need not make such a determination at this juncture. If the breach of warranty claim is viewed as sounding in tort, the law of Colorado governs for the reasons given in the section of this opinion discussing plaintiffs' tort actions in negligence and strict

products liability. If the action is interpreted as sounding in contract, Colorado law governs the rights of the parties for the reasons discussed in this section.

**7.** Section 188 of the Restatement (Second) of Conflict of Laws (1971) provides:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation, and place of business of the parties.

*See e.g., Simmons v. American Mutual Liability Ins. Co.,* 433 F.Supp. 747, 748 (S.D. Ala.1976), *aff'd without op.,* 560 F.2d 1022 (5th Cir. 1977) ("Alabama has, under the Uniform Commercial Code, adopted a choice of law rule based upon the most significant relationship to the transaction, Code of Ala. Title 7A, § 1–105(1)") *See also, Westerman v. Sears, Roebuck & Co.,* 577 F.2d 873, 879 n.7 (5th Cir. 1978); *Tucker v. Capitol Machine, Inc.,* 307 F.Supp. 291 (M.D.Pa. 1969); *General Electric Cred. Corp. v. R.A. Heintz Construction Co.,* 302 F.Supp. 958 (D.Oregon 1969); *Wilcox v. Wilcox,* 26 Wis.2d 617, 133 N.W.2d 408, 415 (1965) for the proposition that the appropriate relations test of § 1–105 of the U.C.C. requires choosing the jurisdiction which is the center of gravity or has the most significant relationship to a breach of warranty action under the Uniform Commercial Code.

Based on the interpretation of the U.C.C. conflicts rule by courts in other jurisdictions, this court is of the opinion that the Connecticut Supreme Court would also apply the significant relationship test in a contract action governed by the U.C.C. *Grand Sheet Metal Products v. Aetna Casualty and Surety Co.,* 500 F.Supp. 904 (D.Conn.1980) cited by the defendant, as well as *Breen v. Aetna Casualty and Surety Co.,* 153 Conn. 633, 220 A.2d 254 (1966); and *Whitfield v. Empire Mutual Insurance Co.,* 167 Conn. 499, 356 A.2d 139 (1975) wherein the Supreme Court applied the old "beneficial operation" test are not to the contrary as all involved questions pertaining to the construction of insurance contracts rather than actions arising under the U.C.C.

In the absence of a contractual provision setting forth the parties' choice of law, the jurisdiction which bears the most appropriate and significant relation to the action is Colorado. The reasons justifying this result are essentially the same as those compelling the application of Colorado law to the plaintiffs' strict liability and negli-

gence counts, since sections 145 and 188 of the Restatement (Second) of Conflict of Laws are based on the same analytical exercise. As set forth in the earlier section of this opinion concerning plaintiffs' tort counts, Colorado's interest in the litigation outweighs that of Connecticut and West Virginia simply in terms of the number of contacts it has with the case. In addition, as discussed in that earlier section, application of Colorado law will advance the public policies of that state without detracting from those of Connecticut and West Virginia. The Colorado Wrongful Death Act provides that survivors are to be insulated from punitive or exemplary damages. Thus Connecticut's interest in seeing its citizens fully compensated for their pecuniary losses will be adequately served by the application of Colorado law. Moreover, because Jeppesen is not a West Virginia corporation, application of the Colorado Wrongful Death Act will not violate West Virginia's former policy that local defendants be immune from damages in excess of $110,000.

Accordingly, as in the case of plaintiffs' tort counts, the "most significant relationship" analysis of the Restatement (Second) counsels the application of Colorado law to plaintiffs' contract counts.

### THE MEASURE OF RECOVERY

Having found that the substantive law of Colorado should apply to plaintiffs' counts of negligence, strict products liability and breach of warranty, this court must nevertheless consider that when considering damages in a diversity case, the court is obliged to utilize the measure of recovery that a state court of Connecticut is required to apply. Plaintiffs argue that the measure of damages recoverable is a matter of remedy rather than rights of the parties, and thus is properly governed by the more generous law of the forum, Connecticut.

---

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state,

the local law of this state will usually be applied except as otherwise provided in §§ 189–199 and 203.

Connecticut indeed has long adhered to the traditional rule that remedies as opposed to substantive rights are to be determined by the law of the forum, *Rich v. Dixon*, 153 Conn. 52, 56, 212 A.2d 417, 419 (1965); *Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061 (1977). However, the issue to be resolved is whether a limitation on an award of damages is a matter of remedy or a matter of substantive right. There are not many Connecticut decisions dealing with this precise issue, but this court believes that its colleague, Judge Blumenfeld, was correct a decade ago in interpreting the Connecticut law to be that the measure of damages is substantive and not remedial. His conclusion was affirmed by the Second Circuit in *Patch v. Stanley Works*, 448 F.2d 483, 490–1 (2d Cir. 1971). Judge Waterman, writing for a unanimous court, was dealing with a wrongful death action instituted in Connecticut, but an action that resulted from an explosion which occurred in New Hampshire. Connecticut's wrongful death statute does not contain any limitation on damages, but the comparable law of New Hampshire had a limitation of $40,-000. Judge Blumenfeld instructed the jury to govern its award by that maximum limitation and the Court of Appeals affirmed by quoting language from *Bissonnette v. Bissonnette*, 145 Conn. 733, 734, 142 A.2d 527, 528 (1958) which held that "the creation and extent of liability in tort are fixed by the law of the state in which the tort is committed."

Obviously, Judge Blumenfeld and the Second Circuit panel interpreted the word "extent" to refer to the measure of the damages, including any limitation placed on recovery by the jurisdiction wherein the injury had been sustained. *Bissonnette*, however, was not the sole, or even the most important, authority on which the Court of Appeals rested its affirmance in *Patch*. Judge Waterman, at 448 F.2d 492–3 found completely in point and most persuasive the holding of the Connecticut Supreme Court in *Thomas Iron Co. v. Ensign-Bickford Co.*, 131 Conn. 665, 668, 42 A.2d 145, 146 (1945) wherein the court held that when a statute gives rise to a right of action which did not exist at common law, any limitations on that action that are embodied in the statute serve to limit the substantive right created by the statute, and are more than purely remedial. Accordingly, as the Second Circuit noted, Connecticut will apply a foreign statutory remedy whenever the foreign remedy is so inseparable from the cause of action that it must be enforced to preserve the integrity and character of the cause of action. The Colorado Wrongful Death Act fits all of those requirements, and hence this court is confident that the Connecticut Supreme Court would apply the foreign damages limitation of Colorado rather than the unlimited wrongful death provisions of Connecticut.

Plaintiffs' interpretation of two recent Connecticut decisions, *Gibson v. Fullin*, 172 Conn. 407, 374 A.2d 1061 (1977) and *Allstate Insurance Co. v. Semple*, 36 Conn.Supp. 232, 416 A.2d 1211 (1979) is unpersuasive. The plaintiffs claim that these two decisions indicate a change in Connecticut's prior decisions just reviewed which held that a limitation on damages is a substantive rather than remedial issue. To the contrary, this court believes that those two decisions reaffirm the earlier Connecticut decisions, but are decided on the basis of circumstances peculiar to each case, which circumstances do not exist in the matter before this court.

In *Gibson*, the Supreme Court quoted with approval the language of *Bissonnette* and of *Dixon* upon which this court has relied and it found that there was "no compelling reason to abandon the traditional rule" in order to adopt the "most significant relationship" test of the Restatement (Second) of Conflict of Laws, reviewed at length earlier in this opinion. The court then at 172 Conn. 411–13, 374 A.2d 1061 expressly noted that if the governing law is the statute of another state, "the choice includes not only the pertinent statute but also its construction by the highest tribunal of the jurisdiction of the statute." Accordingly, the Connecticut court properly reviewed the Florida statute, since the place of injury in *Gibson* was Florida. The Con-

necticut court determined that the Florida legislature and the Florida courts had failed to set out a clear position as to retroactivity of the repeal of the Florida guest statute. The Connecticut court could not determine the Florida policy, but noted that Connecticut policy disfavoring retrospective laws affecting substantive rights of the parties is a firm policy, clearly so indicated by the Connecticut Legislature and by the Connecticut courts. Accordingly, the court felt it proper to apply in this limited situation the Connecticut "articulated policy so well stated in construing the repeal of our own guest statute."

The decision of State Referee David Jacobs, an experienced jurist, in *Allstate Insurance Co. v. Semple, supra,* likewise involved special circumstances. Judge Jacobs was dealing with Connecticut residents operating motor vehicles involved in an accident in Connecticut. It happened that a passenger in one of the vehicles was a resident of Iowa and as such possessed an insurance policy issued in Iowa containing an uninsured motorist coverage. She brought a claim in arbitration as required under those policies and the arbitrator applied Connecticut law, containing a far more generous limitation than that which prevailed in Iowa. Allstate appealed the arbitrator's award, and Judge Jacobs affirmed that award, that the case really did not involve any conflict of law issues at all. He was persuaded by the fact that the accident occurred in Connecticut and that although a contract may have been entered into in Iowa, the contract was one that was meant to accept liability that could vary according to the law of the jurisdiction in which the motor vehicle was being operated.

In short, no cases have been brought to the attention of this court that would lead to any conclusion other than that Connecticut adheres to the principles of law set forth in *Thomas Iron Co. v. Ensign-Bickford Co., supra,* as accepted by this court and by the Second Circuit in *Patch v. Stanley Works, supra,* and in this instance the court is bound to instruct the jury that it is governed by the $45,000 limitation of the Colorado statute in the case involving the death of Erik Wahlund.

To sum up, this court finds that the law of Colorado, including that state's measure of recovery in a wrongful death action, should govern all of plaintiffs' counts against the defendant Jeppesen. For the reasons stated herein, the Jeppesen navigational chart is properly classified as a product, and the court accordingly denies Jeppesen's motion to dismiss plaintiffs' strict liability counts against it.