JACKSON, ADMR., APPELLANT, *v.*
CITY OF FRANKLIN; B. D. MORGAN &
CO., APPELLEE, ET AL.

(No. 10773—Decided
July 14, 1988.)

*Irving I. Saul; Coolidge, Wall, Womsley & Lombard Co., L.P.A., Terence L. Fague* and *Janice M. Paulus,* for appellant.

*Freund, Freeze & Arnold* and *Neil F. Freund,* for appellee.

BROGAN, J. The instant appeal results from the order of the Montgomery County Common Pleas Court granting summary judgment to the appellee.

The plaintiff-appellant, Joyce J. Jackson, as administratrix of the estate of her son, Jonathan Jackson, filed a wrongful death action against the defendant-appellee, B.D. Morgan & Company ("defendant") contending that defendant as a general contractor provided labor, material and equipment in the construction of the swimming pool owned and operated by the city of Franklin and Franklin Township as a recreational facility for the use of the public.

Also joined as a defendant was Midwestern Pool Company, who the plaintiff alleged contracted with the city and township to provide services for the design and positioning of the swimming pool and appurtenances, including the preparation of plans and specifications for such facility.

The plaintiff alleged that her son, Jonathan, on July 27, 1986, paid admission to the pool and while swimming underwater lost consciousness and remained submerged for ten or more minutes resulting in his death. Plaintiff alleged that her son was discovered at the bottom of the pool along the western edge of the deep area.

The defendant subsequently moved for summary judgment and attached the affidavit of Charles Morgan. Morgan stated he was the company president and that the company bid on and received the prime contract to furnish labor and material to complete the construction of a swimming pool development for the city of Franklin, Ohio.

He further stated that his company, with the assistance of subcontractors, built the pool and the appurtenances in accordance with the "Specifications for the Construction of a Swimming Pool Development at Franklin, Ohio, as established by Midwestern, Inc." Further, Morgan

stated that his company did not design, position or prepare plans, drawings, specifications or directions, regarding the design of the swimming pool or any of the appurtenances thereto. Further, he stated his company did not design or choose the location of the lifeguard chairs at the Franklin Community Park swimming pool.

Morgan stated that his company never operated or controlled the swimming pool referred to in the complaint, and that his company fully performed its obligations as the general contractor in accord with the terms and specifications provided by Midwestern, Inc. Lastly, plaintiff alleged that the inordinately long delay in discovering her son in the pool was the proximate cause of his death and was caused by the negligent failure to construct and position lifeguard chairs so as to provide a clear, unobstructed view of the pool bottom as required by the Ohio Administrative Code.

In a second cause of action, the plaintiff alleged the defendant was strictly liable within the purview of R.C. 2125.01 and 2125.02 because the defendant's defective designing, positioning and constructing of the swimming pool and its appurtenances gave rise to an unreasonably dangerous condition because the positioning of the lifeguard chairs would allow a swimmer who became unconscious while underwater at the western edge of the deep area during the later afternoon on sunny days to be at risk to remain submerged and undiscovered for a long period of time due to the glare of the sun and the shadows of the diving boards on the water. Morgan stated his company was never made aware or given notice that the placement of the lifeguard chairs would be dangerous to users of the pool.

The plaintiff responded with a memorandum in opposition to the motion but provided no evidentiary material in opposition to the affidavit of defendant's chief officer.

In sustaining the defendant's motion for summary judgment on the plaintiff's negligence cause of action the trial court found that there was "no evidence submitted that the contract was performed in a negligent manner or differently from the design of the pool given to the City of Franklin by Midwest." The court also found that "no evidence has been submitted to show that any of the defendants had knowledge of anything that was likely to or could foreseeably cause injury or damage."

In granting summary judgment on plaintiff's strict liability cause of action, the trial court noted, "there is no allegation in the complaint that the general contractor or any of the subcontractors furnished anything except construction or installation and furnished labor and materials for that purpose."

In appellant's first assignment of error, she contends that the trial court erred in granting summary judgment for the defendant on the negligence claim because defendant's compliance with the contract's specifications does not constitute ordinary care as a matter of law.

In support of her assignment, appellant places reliance on 2 Restatement of the Law 2d, Torts (1965) 293, Section 385, which provides:

"One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others."

Initially, it was held that, while the contractor would be liable for any injury resulting from his negligence before his work was completed, his responsibility was terminated, and he was not liable to any third person once the structure was completed and accepted by the owner. *Sumner* v. *Lambert* (1953), 96 Ohio App. 53, 54 O.O. 173, 121 N.E. 2d 189; Annotation (1958), 58 A.L.R. 2d 865, 873.

The original justification for such a rule was the lack of privity between the contractor and the third party, but as the privity barrier was successfully assaulted, the grounds for nonliability were chiefly (1) there would be no end to a contractor's litigation with third persons if liability did not cease when the work contracted for was accepted, (2) the proximate cause of the injury to a third party was the owner's negligence in maintaining such real property, not the contractor's in constructing it, the chain of causation from the negligent act of the contractor being broken by the intervening responsible human agency of the owner, and (3) a wise and conservative public policy confines a contractor's liability for negligence in construction of a complicated structure to the owner or contractee. Annotation, *supra,* at 870.

The earliest exception to the general rule of nonliability was to hold the contractor liable for "something like fraud" if he turned the work over knowing it was dangerously defective. *O'Brien* v. *American Bridge Co. of New Jersey* (1910), 110 Minn. 364, 125 N.W. 1012. Other cases relied on the analogy of the seller of goods, and found a duty to use care where the product of the work could be regarded as "inherently" or "imminently" dangerous. *Holland Furnace Co.* v. *Nauracaj* (1938), 105 Ind. App. 574, 14 N.E. 2d 339; *Johnston* v. *Long* (1943), 56 Cal. App. 2d 834.

Where there was an interference with the rights of the public, or with the use and enjoyment of adjoining land, the contractor was held liable for creating a nuisance, and where his conduct could be found to go entirely beyond and outside the contract, the question was treated as one of ordinary negligence liability. *Delaney* v. *Supreme Investment Co.* (1947), 251 Wis. 374, 29 N.W. 2d 754; *Ackerman* v. *Ellis* (1911), 81 N.J.L. 1, 79 A. 883; *Littell* v. *Argus Production Co.* (C.A. 10, 1935), 78 F. 2d 955.

As in the case of the seller of chattels, the exceptions tended to gradually swallow up the prevailing rule until the analogy of *MacPherson* v. *Buick Motor Co.* (1916), 217 N.Y. 382, 111 N.E. 1050, was accepted.

It is now the almost universal rule that the contractor is liable to all those who may foreseeably be injured by the structure, not only when he fails to disclose dangerous conditions known to him, but also when the work is negligently done. *Moran* v. *Pittsburgh-Des Moines Steel Co.* (C.A. 3, 1948), 166 F. 2d 908, certiorari denied (1948), 334 U.S. 846; *Hunter* v. *Quality Homes, Inc.* (1949), 45 Del. 100, 68 A. 2d 620. This applies not only to contractors doing original work, but to supervising architects and engineers as well. *Paxton* v. *Alameda Cty.* (1953), 119 Cal. App. 2d 393, 259 P. 2d 934.

In Prosser & Keeton, Law of Torts (5 Ed. 1984) 723-724, Section 104A, it is stated:

"One important limitation recognized in several cases is that the contractor is not liable if he has merely carried out carefully the plans, specifications and directions given him, since in that case the responsibility is assumed by the employer, at least where the plans are not so obviously defective and dangerous that no reasonable man would follow them. *Leininger* v. *Stearns-Roger Manufacturing Co.,* 1965, 17 Utah 2d 37, 404 P.

2d 33; *Johnson* v. *City of San Leandro,* 1960, 179 Cal. App. 2d 794, 4 Cal. Rptr. 404; *Davis* v. *Henderlong Lumber Co.,* N.D. Ind. 1963, 221 F. Supp. 129; *Person* v. *Cauldwell-Wingate Co.,* 2d Cir. 1951, 187 F. 2d 832, certiorari denied 341 U.S. 936, 71 S. Ct. 855, 95 L. Ed. 1364; *Lydecker* v. *Board of Chosen Freeholders of Passaic County,* 1918, 91 N.J.L. 622, 103 A. 251." [See, also, *Tyson* v. *Clower* (1960), 67 N.M. 388, 356 P. 2d 46.]

A contractor who constructed a building and a canopy according to plans and specifications furnished it by the United States Government and its duly authorized architect was held in *Ryan* v. *Feeney & Sheehan Bldg. Co.* (1924), 239 N.Y. 43, 145 N.E. 321, not liable for injuries resulting to a third person from the collapse of such canopy, after the acceptance thereof by the Government, under the weight of snow falling thereon, where the contractor had fully complied with such plans and specifications, as it was required to do under its contract — the canopy having fallen because the supporting irons or braces did not have sufficient spread or were fastened at too low an angle with the base. The court said: "How was an ordinary contractor or builder to know this? The matter was for the engineers and architects to determine and design. The builder's experience might have suggested that another construction would have been better but it was not its judgment on these matters which was to be taken, and it was justified in relying upon the experience and skill of the architect and supervising engineer." The rule was applied that in the absence of anything to show that the plans and specifications were so obviously defective that a contractor of average skill and ordinary prudence would not have attempted the construction according to the plans, a builder or contractor is justified in relying upon the plans and specifications which he has contracted to follow. The court took the view that this was not the situation in the present case. The court said: "The defects if any should have been so glaring and out of the ordinary as to bring home to the contractor that it was doing something which would be likely to cause injury. In this case it was justified in relying on the architect and the government engineers for the strength and angles of the braces or supporting rods."

Recently in the case of *Terry* v. *New Mexico State Highway Comm.* (1982), 98 N.M. 119, 645 P. 2d 1375, the New Mexico Supreme Court held that a contractor was not liable for wrongful death occurring on a curve on a highway where the contractor neither designed nor engineered plans and specifications for project and carefully carried out plans, specifications and directions by the owner. The court noted at 123, 645 P. 2d at 1379:

"Brown [the contractor] claims that it is exempt from liability under the first exception, since its uncontradicted affidavits establish that it satisfactorily completed the work in accordance with the terms and conditions of the construction contract, and that the plans and specifications provided by the State were standard for this type of project and contained no obviously dangerous elements. Brown neither designed nor engineered the plans and specifications for the project. These affidavits are sufficient to support Brown's motion for summary judgment.

"Plaintiffs have failed to produce any contrary evidence as to these material facts. Plaintiffs refer to a traffic engineering consultant's written report, which concludes that the [highway] curve is hazardous. It states: 'Regardless of the reason for building the curve as it is, there is no question in

my mind that in so building this curve, a hazard was created.' The hazard results from a combination of factors, including inadequate pavement and poor signing as well as deceptive curvature and inconsistent banking. However, nothing in the report indicates that Brown did not carefully carry out the plans, specifications and directions given, or that these plans were 'so obviously dangerous that no reasonable man would follow them.' * * * These are the relevant fact determinations here. Plaintiffs' report does not reach these questions and does not contradict the affidavits put forth by Brown.''

Reduced to its essentials, plaintiff's argument is that her son died when he lost consciousness while swimming and his body was discovered at the bottom of the pool along the western edge of the deep area of the pool. The plaintiff acknowledged in her complaint that the defendant constructed the swimming pool and its appurtenances (the lifeguard chairs) *in accordance with* the plans and specifications provided the defendant by Midwestern Pool Company which had entered into a contract for said services with the city and township.

She contends the placement of these chairs created a dangerous condition whereby ''the lifeguard chairs established to monitor the deep area did not at the time of her son's drowning have a clear unobstructed view of the pool bottom along the western edge of the pool.'' More specifically, she stated this dangerous condition resulted because a swimmer who would become unconscious while swimming underwater at or near the western edge ''during the late afternoon on sunny days would be at risk to remain submerged and undiscovered for an inordinately long period due to the glare of the sun and the shadows of the diving boards on the water.''

The defendant has produced the affidavit of its president who asserted that his company built the pool to plans and specifications provided to it by Midwestern, and that he was not made aware that the placement of the chairs would be dangerous to users of the pool. Plaintiff filed no evidentiary material in opposition to the motion.

We believe that reasonable minds could only conclude that the dangerous condition alleged in the plaintiff's complaint was not such an *obvious defect* in the design of the pool and its appurtenances that no reasonable contractor would have built the pool and its appurtenances as designed. Accordingly, we find the trial court properly found that there were no material facts in dispute and the defendant was entitled to judgment as a matter of law. The first assignment of error is overruled.

In her second assignment, plaintiff contends that the trial court erred in granting summary judgment for the defendant on her strict liability claim when defendant's status as a general contractor does not preclude liability as a matter of law.

Plaintiff contends that the defendant's design and construction of the swimming pool created an unreasonably dangerous condition so as to give rise to defendant's strict liability in tort to the plaintiff. 2 Restatement of the Law 2d, Torts (1965) 345, Section 402A, states:

''(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

''(a) the seller is engaged in the business of selling such a product, and

''(b) it is expected to and does reach the user or consumer without

change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The Ohio Supreme Court adopted Section 402A of the Restatement as the standard for strict liability in tort in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267.

Plaintiff contends that a contractor who supplies materials for a job is subject to strict liability in tort when it fails to provide materials fit for their intended use, citing *Iacano* v. *Anderson Concrete Corp.* (1975), 42 Ohio St. 2d 88, 71 O.O. 2d 66, 326 N.E. 2d 267. In *Iacano,* the defendant contractor company entered into a contract for the installation of a driveway, patio, and sidewalk at plaintiff's home. After performance by the defendant, the driveway developed "pop outs" as a result of freezing and thawing. The defendant blamed the result on soft shell aggregates supplied by a concrete company. The Ohio Supreme Court upheld a judgment in favor of plaintiff against the contractor and concrete company. The court held an action in tort, based on the properly pleaded theory of implied warranty, may be maintained to recover damage to property. This case did not establish that a home could be a defective product, but that there was a defect in some product (concrete) installed therein rendering damage to the property.

In *Lowrie* v. *Evanston* (1977), 50 Ill. App. 3d 376, 365 N.E. 2d 923, the Illinois appellate court held that a building (a parking garage) was not a product within the contemplation of Section 402A. In that case, the plaintiff's decedent died from a fall from the upper level of an open air parking garage. Plaintiff contended that the garage and parking spaces were in a defective condition and not in a reasonably safe condition because they were so constructed, designed and engineered as to produce a hazardous situation to the decedent user. The court noted at 383-385, 365 N.E. 2d at 928-929:

"In view of the foregoing, we are of the belief that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of its use in the Restatement rather than, as plaintiff here would have us do, to focus on the dictionary definition of the word. A general statement of these reasons appears in comment *c* of § 402A, which states:

" 'On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.' Restatement (Second) of Torts, Explanatory Notes § 402A, comment *c,* at 349-50 (1965).

"Further, as one writer has stated:

" '[I]n order to determine whether a particular transaction comes within the definition of the "sale of any product" it becomes necessary to isolate the social policy justifications for the imposition of strict liability.

" 'Ultimately both the definition of "product" and "sale" can be determined only with reference to these policy justifications. Generally, where they apply, the court will label the transaction as involving the sale of a product to which strict liability applies. Thus the social policy underlying the doctrine has become the definition of a "product" and "sale." ' Symposium on Products Liability: What is or is not a Product Within the Meaning of Section 402A, 57 Marq. L. Rev. 623, 626-27 (1974).

"Thus, we believe that strict liability did not evolve simply because something was a product. The policy reasons brought it into being and continued to expand it. It is those reasons then that should determine what is a product and not that it was simply something resulting from production, or 'produced naturally or as a result of a natural process,' the dictionary definition, or the meaning given in 72 C.J.S. *Products* at 1210 (1951) that defendant would have us accept: 'Anything produced, * * * as a result of * * * labor, or thought * * *.' Such definitions would exclude water, wood, all living things, and anything else that remains in the natural state at the time it is supplied or distributed. Significantly, whole blood which was found to be a product in *Cunningham* [v. *MacNeal Memorial Hosp.* (1970), 47 Ill. 2d 443, 266 N.E. 2d 897,] would also be excluded.

"We have considered those underlying policy reasons in their relation to the development of the strict products liability concept, and we have come to the conclusion that a building such as is involved here is not a product within the meaning of the use of that term in § 402A.

"We have also taken into consideration in reaching this conclusion the fact that in *Cox* v. *Shaffer* (1973), 223 Pa. Super. 429, 302 A. 2d 456, which appears to be the only case in the country involving the specific question, the court held, without stating any supporting reasons, that a silo constructed on a farmer's land was not a product within the meaning and intent of § 402A. Additionally, we have considered the significance of a statement by the court in *Greenman* v. *Yuba Power Products, Inc.* (1963), 59 Cal. 2d 57, 63-64, 27 Cal. Rptr. 697, 701, 377 P. 2d 897, 901, the progenitor of the doctrine, that the purpose of strict liability is 'to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. *Sales warranties serve this purpose fitfully at best.* [Citation.]' (Emphasis added.) This statement not only articulated the purpose but also the court's reason for imposing strict liability. Sales warranties then could not adequately provide a remedy for injured plaintiffs, because the doctrines of privity and express disclaimers of warranty would bar recovery. At that time, the *Greenman* court believed that a judicial remedy should be provided, and it conceived the strict liability doctrine. In Illinois, because judicial remedies are presently available against those responsible for defective construction on negligence and implied warranty theories, the reason expressed in *Greenman* does not appear to justify bringing a constructed building within the ambit of strict liability.

"Moreover, we believe that the framers did not originally contemplate

a structure such as a building to be a product. This is evident (a) from the fact that although comment *d* lists a number of products within the purview of § 402A, it does not include buildings; and (b) because the liability of builders is described and articulated in other sections of the Restatement, it appears to us that if structures and their builders were to be held to strict liability the framers of the Restatement would not have included the standard of care pertinent to builders, contractors and sellers of real property set forth in §§ 353, 385 and comment *e* of 389.

"Plaintiff also contends, as she does with respect to the garage structure, that the parking spaces within it were in a defective and not reasonably safe condition. We believe, however, that our reasoning in holding that the garage was not a product as contemplated by § 402A is equally applicable to the parking spaces which were part of the structure itself."

In *Schipper* v. *Levitt & Sons, Inc.* (1965), 44 N.J. 70, 207 A. 2d 314, the Supreme Court of New Jersey held that a builder vendor of mass-produced homes could be held liable to a child of the purchaser's lessee, on warranty or strict liability principles, for a defect in hot water distribution system design, which resulted in excessively hot water issuing from bathroom taps. The court noted at 90, 207 A. 2d at 325:

"* * * We consider that there are no meaningful distinctions between Levitt's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. That being so, the warranty or strict liability principles of *Henningsen* [v. *Bloomfield Motors, Inc.* (N.J. 1960), 161 A. 2d 69] and *Santor* [v. *A. & M. Karagheusian, Inc.* (N.J. 1965), 207 A. 2d 305] should be carried over into the realty field, at least in the aspect dealt with here." See, also,

*Kriegler* v. *Eichler Homes, Inc.* (1969), 269 Cal. App. 2d 74, 74 Cal. Rptr. 749 (mass-produced homes are a "product" and are subject to strict liability principles; distinguished ordinary sales of real estate, which was held not to be a product in *Conolley* v. *Bull* [1968], 258 Cal. App. 2d 183, 195, 65 Cal. Rptr. 689, 696-697).

Dean Prosser and Professor Keeton note that the rules relating to strict liability of the housing merchant are inapplicable to the building contractor:

"The building contractor who, pursuant to a construction contract with an owner of land, constructs a hotel, office building, residence or other structure on owner's land, must be carefully distinguished from the real estate promoter or housing merchant who constructs residences and other buildings on his own land and sells or leases such dwellings and other structures to others. The transaction of the building contractor has generally been regarded as a transaction involving the rendition of a service even though the result of the service is to supply a structure or building to the owner. Therefore, the rules relating to strict liability of the housing merchant are inapplicable to the building contractor.

"The generally accepted view has not been to impose strict liability, either on a warranty or tort theory, to the building contractor who is regarded as being engaged primarily in the rendition of a service, *i.e.*, the construction of a building on land owned by another pursuant to plans and specifications provided by the owner. Nevertheless, strict liability has been imposed on a building contractor on the theory that in essence the structure, which is completed and transmitted under the contract, is a product and sold within the meaning of a sale as contemplated by the rule for strict liability.

"The ultimate answer to the ques-

tion of strict liability should depend on whether or not the typical or paradigmatic building contractor is a sufficiently different type of enterpriser from the housing merchant to warrant a distinction being made between them as regards the subject of strict liability for defects attributable to (a) construction defects, (b) defects in products incorporated into the building, and (c) design defects of the structure." Prosser & Keeton, *supra,* at 724, Section 104A.

The general rule is that strict liability is not applicable to persons providing professional services. *La Rossa* v. *Scientific Design Co., Inc.* (C.A. 3, 1968), 402 F. 2d 937; *K-Mart Corp.* v. *Midcon Realty Group of Conn., Ltd.* (D. Conn. 1980), 489 F. Supp. 813.

Ordinarily, strict liability is not applied to architects because negligence can be proved. *La Rossa, supra.* In *K-Mart Corp.* v. *Midcon Realty Group Ltd., supra,* a merchant asserted a strict liability theory against an architect who had designed the store the merchant occupied because the roof collapsed. The federal district court held, first, that the strict liability theory is not applicable to professional services, and that assuming *arguendo* that the designs were "products" sold by the architects, the merchant did not use the products in the condition in which they were sold — he used the building, not the plans. The court noted that strict liability theory was intended to apply to those who market defective products to the general public in a mass-distribution context. *Id.* at 818. The court also recognized, however, that the doctrine of strict liability could apply to "the design and development of buildings which, like ordinary consumer products, are mass marketed to the public. * * *" *Id.*

In determining whether strict liability may or should be applied to design professionals, an examination of the policy arguments justifying its application to manufacturers is critical. The first justification is the difficult burden of proof that a consumer of mass-produced items would bear in a negligence action. It may be impossible for such a consumer to trace a defective item back through the distribution and production systems of a manufacturer. This justification is clearly inapplicable when one-of-a-kind projects are at issue and the alleged defect is in the design of a single product rather than a mass-produced product. In such design cases, an injured party knows where to go to find a defect and is not presented with a long and technical process to trace production back to its early stages. Therefore, application of strict liability to architects is not justified on the basis of an onerous burden of proof. Note, The Crumbling Tower of Architectural Immunity: Evolution and Expansion of the Liability to Third Parties (1984), 45 Ohio St. L.J. 217.

It would seem anomalous that the contractor who merely follows the designs and specifications of another in the construction of a building would be liable in a strict liability in tort action while the person who provided the design and specifications would not.

In short, we find the case of *Lowrie* v. *Evanston, supra,* to be persuasive. Accordingly, we find the trial court properly found that plaintiff had not established an action for strict liability in tort for the defective design and construction of the swimming pool and its appurtenances by the defendant. The second assignment of error is likewise overruled.

Judgment of the trial court will be affirmed.

*Judgment affirmed.*

KERNS, P.J., and WILSON, J., concur.