JACKSON, Admx., Appellant,

v.

CITY OF FRANKLIN et al., Appellees.

[Cite as *Jackson v. Franklin* (1991), 72 Ohio App.3d 431.]

Court of Appeals of Ohio,
Montgomery County.

No. CA–11895.

Decided Feb. 8, 1991.

*Irving Saul* and *Terence L. Fague,* for appellant.
*William Kaufman,* for appellees.

---

WOLFF, Judge.

Joyce Jackson, administrator of the estate of her son Jonathan Jackson, deceased, appeals from the judgment entered upon the jury's verdict in favor of appellees, city of Franklin ("city") and Franklin Township Board of Trustees ("township") on a wrongful death claim.

Jonathan "Thumper" Jackson died as a result of fresh water drowning when he was sixteen years old. At the time of his death, he had been swimming at a swimming pool jointly owned and operated by the city and the township. The pool was rectangular in shape with the deep area located in the center of the pool and shallow areas at each end. There were five lifeguard chairs positioned around the perimeter of the pool.

It was the policy of the pool to have ten-minute break periods every hour on the half hour. Thumper died sometime near the 5:30 break. Immediately before the 5:30 break, all five lifeguard stations were manned. It was the pool's practice to have only one lifeguard on duty during the hourly breaks. On the day of Thumper's death, Lisa Hughes, in chair number four, was the only lifeguard on duty during the 5:30 break.

There was conflicting evidence as to the exact time Thumper died. Thomas Clifford, who accompanied Thumper to the pool that day, testified that Thumper began to swim laps underwater a few moments before the lifeguard

blew the whistle to signal the start of the 5:30 break period. Clifford also testified that Thumper enjoyed swimming laps underwater and frequently attempted to see how many laps he could swim underwater before coming up for air. Clifford did not see Thumper leave the pool when the break began, nor did he see Thumper at any time during the ten-minute break. Shelley West testified that she saw Thumper hit his head on the diving board immediately after the break ended. West did not see Thumper leave the pool after the dive. She then dove off the board and discovered Thumper's body at the bottom of the pool beneath the low diving board. She shook his foot to see if he was playing. When he did not move, she informed lifeguard Gina Sorrell that there was a boy at the bottom of the pool.

Sorrell was stationed at lifeguard chair number two which was located next to the low diving board. The lifeguard in this chair was responsible for monitoring the shallow area of the pool. After she was alerted to the presence of the body, Sorrell yelled out to Lisa Hughes, who was stationed in lifeguard chair number four, to look for a body at the bottom of the pool. The lifeguard in chair number four had the responsibility of monitoring the deep area where the diving boards were located. Hughes looked into the water but was unable to see anything because of the glare on the water caused by the late afternoon sun. It was not until she stuck her head into the water that she discovered Thumper's body. Hughes recovered the body and unsuccessfully attempted to resuscitate Thumper.

All of this occurred within approximately five minutes of the end of the 5:30 break. Depending upon whose testimony was believed, the jury could have concluded that Thumper had been submerged from between two minutes, the time elapsed after he dove off the diving board after the 5:30 break ended, to fifteen minutes, the time elapsed after he could have lost consciousness while swimming laps underwater before the 5:30 break began.

Joyce Jackson brought an action for wrongful death against the city, the township, and twelve other defendants claiming that her son's death was the result of an "inordinately long delay" in the discovery of his submerged body. In the first two causes of action, Jackson alleged that the appellees, as well as various other defendants, breached their duty to design, position, and construct the pool so the lifeguard chairs would provide a clear, unobstructed view of the bottom of the pool. Her third cause of action was directed only against the city and the township, and alleged that the two entities breached their duty to operate a recreational facility in a reasonably safe manner, which duty was breached when they failed to adopt a procedure to minimize the risk that an unconscious underwater swimmer would remain submerged and undiscovered for an inordinately long period of time. Subsequently, all

defendants, except the city and the township, were dismissed on motion for summary judgment.

The case was tried before a jury on the third cause of action. As part of its responsibilities, the jury was given a set of interrogatories to answer during its deliberations. The interrogatories instructed the jury that whether each question was to be answered was contingent upon the response to the previous question. Thus, when the jury answered the first interrogatory in the negative, finding that the city and township were not negligent in the construction and operation of the pool, it ceased its deliberations and never reached the remaining questions.

Jackson advances two assignments of error:

"The jury's finding on Interrogatory No. 1, that is, that the defendants were not negligent, was contrary to the manifest weight of the evidence that the premises were not in a reasonably safe condition, and contrary to the unrebutted evidence that no warning of a concealed danger was provided to appellant's decedent.

"The trial court erred by refusing to admit in evidence regulations for the operation of swimming pools as adopted by the Warren County Board of Health."

In Jackson's first assignment, she argues that the jury's finding that the appellees were not negligent was against the manifest weight of the evidence. This assignment is premised on the theory that the intense sun glare on the pool water in the late afternoon posed a danger that an unconscious submerged swimmer would remain undiscovered for an inordinately long period. Based on this premise, Jackson argues that the appellees were negligent in two respects: for failure to maintain the pool in a reasonably safe manner and for failure to warn pool users of a concealed danger.

The court, in a jury instruction, explained the duties owed by a landowner to invitees. The instruction, the propriety of which is not challenged by Jackson on appeal, is as follows:

"An invitee is a person who rightfully enters and remains on the premises of another at the express or implied invitation of the owner and for a purpose beneficial to the owner.

"The owner of the premises owes a duty to an invitee to use ordinary care for the invitee's safety to keep the premises in a reasonably safe condition and use ordinary care to provide notice of any concealed dangers of which the owner of the premises has knowledge or which by using ordinary care should have discovered."

Jackson argues that the jury disregarded this instruction when it determined that the appellees were not negligent. She claims that the unrebutted evidence established that the appellees failed to maintain the pool in a reasonably safe condition, and to warn Thumper of a concealed danger.

The evidence disclosed that prior to the 5:30 break, there were six lifeguards on duty. When the 5:30 break commenced, three lifeguards went off duty and were not replaced. Of the three lifeguards who remained on duty, two took a personal break during the ten-minute break period. This left only one lifeguard, Lisa Hughes, on duty during the break. She was solely responsible for monitoring the entire pool. Hughes was located in chair number four. From this position, it was virtually impossible to see the pool bottom in the deep area because the late afternoon sun caused a blinding glare in the deep area. Thumper's body was discovered directly beneath the glare area.

On appeal, Jackson claims that these uncontested facts prove that the pool was not reasonably safe during the 5:30 break period. She claims that the combination of a single lifeguard positioned in chair number four and the glare on the water, which caused a blind spot for that chair, created a dangerous condition for underwater swimmers such as Thumper. Moreover, she claims that the testimony of Holly Mears, the pool's assistant manager, that Mears repeatedly complained to the pool's manager about the glare problem, established that the appellees were aware of the dangerous condition and nevertheless failed to exercise ordinary care to correct it.

She also claims that as to pool users, the blind spot amounted to a concealed danger, and that appellees were negligent in failing to warn her son of that danger.

We do not agree that the evidence established as a matter of law that the appellees negligently failed to maintain the pool premises in a reasonably safe manner or failed to warn of a concealed danger. The court's jury instruction did not set forth a specific course of conduct that was required of the appellees in order to comply with its duties to an invitee. The instruction required the jury to determine whether the pool premises were reasonably safe, and whether a concealed danger existed (which would have given rise to a duty to warn).

The appellees argue that the danger posed by the sun's glare was not concealed. They argue that a person of ordinary powers of observation would have been capable of realizing that an intense sun glare on water would make it difficult to see objects beneath the water's surface. They contend that the danger was open and obvious, and thus there was no duty to warn. Jackson attempts to rebut this argument by relying on our opinion rendered in *Jackson v. Franklin* (1988), 51 Ohio App.3d 51, 554 N.E.2d 932, wherein we

affirmed the summary judgment which dismissed several defendants from the case now before us. Jackson had claimed that several contractors were negligent in constructing the pool because the pool design called for the lifeguard chairs to be positioned in such a way as to create a dangerous condition. One such contractor was B.D. Morgan & Company. The trial court determined that Morgan was not aware that the placement of the lifeguard chairs posed a potential danger that the late afternoon sun would cause a blind spot beneath which a submerged swimmer would not be discoverable. We held that:

"We believe that reasonable minds could only conclude that the dangerous condition alleged in the plaintiff's complaint was not such an *obvious defect* in the design of the pool and its appurtenances that no reasonable contractor would have built the pool and its appurtenances as designed." *Id.* at 55, 554 N.E.2d at 937.

Jackson argues that this holding establishes, as a matter of law, that the alleged dangerous condition was not open and obvious. We do not agree. Our holding in *Jackson* only establishes that the alleged dangerous condition was not so obvious a defect that a pool builder should have questioned the design. Our holding does not resolve the issue of whether, as a matter of law, a pool user should have recognized the danger posed by the sun's glare. Whether the alleged danger was concealed was a question for the jury. As we view the evidence, we conclude that the jury could have reasonably found that the glare upon the water's surface did not create a concealed danger.

■ The evidence disclosed two natural impediments to an unobstructed view of the pool bottom from chair number four: a glare on the water's surface caused by the late afternoon sun, and the disturbance of the water caused by swimmers which made it difficult to see through. The evidence also disclosed that after Thumper's death improvements were made to the pool which counteracted the glare problem. It was the jury's prerogative to decide whether the sun's glare, which created a blind spot in the deep area for chair number four, in conjunction with the then guard chair placement and lifeguard staffing, established a failure by the appellees to maintain the pool in a reasonably safe condition.

■ Despite the evidence as to subsequent remedial measures, the admissibility of which was not challenged at trial, the jury nonetheless concluded that the pool was reasonably safe. Appellees are not guarantors of the safety of the pool users. They are only required to exercise ordinary care. The jury could have reasonably concluded that the visibility problem, and the danger it posed to a submerged swimmer, did not establish a failure by the appellees to exercise ordinary care. The jury could have so concluded despite the evidence

that Holly Mears had repeatedly complained of the glare problem to Scott Miltenberger, the pool manager, who responded that there was nothing he could do to correct the problem other than to suggest that the lifeguard wear sunglasses.

The jury's response to the first interrogatory that the appellees were not negligent is supported by competent, credible evidence and, therefore, the verdict cannot be set aside.

The first assignment is overruled.

In the second assignment, Jackson claims the trial court erred by excluding evidence of regulations promulgated by the Warren County Board of Health ("board"). These regulations governed the operation of swimming pools. Jackson attempted to introduce the regulations as evidence that the appellees had not complied with the regulations and thus fell below the standard of care owed to the decedent. The regulations were adopted by the board in 1976, allegedly pursuant to its authority under R.C. 3709.21.

R.C. 3709.21 provides as follows:

"The board of health of a general health district may make such orders and regulations as are necessary for its own government, for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances. Such board may require that no human, animal, or household wastes from sanitary installations within the district be discharged into a storm sewer, open ditch, or watercourse without a permit therefor having been secured from the board under such terms as the board requires. *All orders and regulations not for the government of the board, but intended for the general public, shall be adopted, recorded, and certified as are ordinances of municipal corporations* and the record thereof shall be given in all courts the same effect as is given such ordinances, but the advertisements of such orders and regulations shall be by publication in one newspaper published and of general circulation within the district. Publication shall be made once a week for two consecutive weeks and such orders and regulations shall take effect and be in force ten days from the date of the first publication. In cases of emergency caused by epidemics of contagious or infectious diseases, or conditions or events endangering the public health, the board may declare such orders and regulations to be emergency measures, and such orders and regulations shall become effective immediately without such advertising, recording, and certifying." (Emphasis added.)

In this case, since the regulations at issue were intended for the general public and not for the government of the board, the board's regulations had to comply with R.C. 731.17 to 731.27 in order to have the force and

effect of law. These provisions govern matters pertaining to municipal ordinances and resolutions. R.C. 731.21, which sets forth the usual mandatory procedures for publication of municipal ordinances, applies to board of health regulations by virtue of R.C. 3709.21. R.C. 731.21 provides as follows:

"All municipal ordinances, resolutions, statements, orders, proclamations, notices, and reports, required by law or ordinance to be published, shall be published as follows:

"(A) In two English newspapers of opposite politics, published and of general circulation in the municipal corporation, if there are any such newspapers;

"(B) If two English newspapers of opposite politics are not published and of general circulation in the municipal corporation, then in one such political newspaper and one other English newspaper published and of general circulation therein;

"(C) If no English newspaper is published and of general circulation in the municipal corporation, then in any English newspaper of general circulation therein or by posting as provided in section 731.25 of the Revised Code, at the option of the legislative authority of such municipal corporation. Proof of the publication and required circulation of any newspaper used as a medium of publication as provided by this section shall be made by affidavit of the proprietor of either of such newspapers, and shall be filed with the clerk of the legislative authority."

When the board enacted the swimming pool regulations on December 8, 1976, it sought to incorporate regulations which had been enacted previously by the Ohio Department of Health in the Ohio Sanitary Code HE–31–9 to HE–31–10 (subsequently Ohio Adm.Code 3701–31–05). These Administrative Code sections set forth the code of conduct to be observed in the area of health and safety requirements for the operation of swimming pools. Of particular relevance to this case is the fact that the board's regulations sought to include that section of the Administrative Code which stated that lifeguard chairs were to be positioned around a pool so as to "provide a clear, unobstructed view of the pool bottom." Ohio Adm.Code 3701–31–05(B). Jackson moved to have these Administrative Code sections admitted, arguing that since chair number four did not have a clear, unobstructed view of the pool bottom at the time of Thumper's death due to the sun glare, then such a violation of Ohio Adm.Code 3701–31–05(B) constituted negligence *per se* or, at the least, evidence that the appellees fell below the standard of ordinary care. The trial court refused to admit the board's regulations, having been persuaded by the appellees' argument that the regulations lacked the force and effect of law. The trial court so found on the grounds that the regulations were not properly

published as required by R.C. 731.21, and that prior to September 1987, the board was not authorized by the General Assembly to promulgate regulations governing the operation of swimming pools.

On appeal, Jackson challenges both of these determinations. We will respond to each argument individually. We begin our review with an examination of whether the board's regulations were properly published.

The board's regulations were published in the Warren County newspaper, The Western Star, for two consecutive weeks beginning December 15, 1976. At trial, Vicki Newdigate of The Western Star testified outside the presence of the jury as to the manner of publication of the regulations. She testified as follows:

"Q. Have you previously looked to determine whether in the legal advertisement section there was notice given in two of those newspapers concerning a regulation adopted by the Warren County Health District at its December 8, 1976 meeting?

"A. Yes.

"Q. Did you find any such advertisement?

"A. Yes.

"Q. Could you please open the newspaper to the particular advertisement?

"A. (Witness complied.)

"Q. Would you indicate the date of the publication first?

"A. December 15, 1976.

"Q. And could you specify the page upon which the advertisement appears?

"A. Page 17, about—

"Q. Could you point out with your finger where it appears?

"A. (Witness indicating.)

"Q. Would you, could you please read into the record the first section of that down to where it reads 'Section 2'?

"A. The two paragraphs?

"Q. First, the headline and on down.

"A. 'Regulations for operation of public swimming pools in Warren County.

"'Regulation establishing standards and governing the operation of public swimming pools in order to protect the public health and provide for the safety of persons using such pools.

" 'Therefore, be it resolved by the Board of Health of the Warren County General Health District as follows:

" 'Section 1. Chapter HE–31 of the Ohio Sanitary Code.

" 'Provisions of HE–31–01 to HE–31–10, inclusive of the Ohio Sanitary Code relating to definitions, authorization to operate, plan approval, design, health and safety, operation, disinfection and quality of water, variance, and other public bathing places shall apply to public swimming pools, both existing and proposed, in Warren County Combined Health District unless otherwise revised in this regulation.' "

She then testified on cross-examination as follows:

"Q. The one question of substance I have is, looking at both of the advertisements that you have, they are identical, are they not?

"A. The articles?

"Q. The published ads.

"A. Yes.

"Q. And you have read a portion of them and we have stipulated to the rest of them so the record is clear, is that true, that in neither of these publications is there any mention of the specific rules of conduct which are to be observed with respect to the design, construction, maintenance, operation of swimming pools?

"A. No, unless under penalty section 3, I don't know if that means the place or the person.

"Q. Well I phrased my question perhaps in legalese, let me bring it down to something that is more understandable. Is there anything in either ad that tells anybody what they're supposed to do with regards to operating a swimming pool or how a swimming pool is supposed to be constructed?

"A. No."

At the close of cross, Mr. Fague, Jackson's attorney, proceeded to stipulate that the full text of the Ohio Administrative Code sections referenced in the publication of the board's regulations was not set forth in the newspaper.

The trial court excluded the board's proposed regulations on the authority of *State v. Waller* (1944), 143 Ohio St. 409, 28 O.O. 351, 55 N.E.2d 654. In *Waller*, the Ohio Supreme Court interpreted R.C. 3709.21 (formerly G.C. 1261–42) as requiring the publication of the full text of a board of health regulation before the regulation could become effective. The Supreme Court held in its syllabus that:

"A publication of a regulation of a district board of health, which omits the rules of conduct to be observed and merely refers to those who may be

affected to a copy of the terms 'on file in the office of the board of health,' is not a compliance with Section 1261-42, General Code, and until proper publication has been made such regulation is not effective and no prosecution may be had thereunder."

The trial court applied *Waller* and held:

"It's interesting to note after the quotation from *State vs. Waller*, the 415 page [28 O.O. at 353, 55 N.E.2d at 657], there must be a publication of the ordinance in full. I think that's what the whole problem is. This is a criminal case, I'll have to agree, but ordinances have to be published in their whole text unless it's an ad for solicitation of bids for a contract or something of that variety and they can say the plans and specifications are available for three dollars or whatever it is, and hundred dollar deposit in the office of the city engineer; if you want to see the real details, come down and give us a hundred dollars and we'll give you the plans. And the case does talk about that."

Jackson argues that notwithstanding *Waller*, reference to the sections of the Ohio Administrative Code at issue was sufficient to comply with R.C. 3709.21 because the principle of incorporation by reference applies. Jackson relies on R.C. 731.231:

*"The legislative authority of a municipality may adopt standard ordinances and codes,* prepared and promulgated by the state, or any department, board, or other agency thereof or any code prepared and promulgated by a public or private organization which publishes a model or standard code, including but not limited to codes and regulations pertaining to fire, fire hazards, fire prevention, plumbing code, electrical code, building code, refrigeration machinery code, piping code, boiler code, heating code, or air conditioning code, *by incorporation by reference."* (Emphasis added.)

■ We agree that R.C. 731.231, which postdates *Waller*, authorizes a board of health, under R.C. 3709.21, to incorporate standardized codes by reference. R.C. 731.231 contains the following publication requirements:

"The publication required by sections 731.21 to 731.25, inclusive, of the Revised Code, shall clearly identify such code, shall state the purpose of the code, shall state that a complete copy of such code is on file with the clerk of the legislative authority for inspection by the public and also on file in the law library of the county or counties in which the municipality is located and that said clerk has copies available for distribution to the public at cost. If the adopting municipality amends or deletes any provisions of such code, the publication shall contain a brief summary of such deletion or amendment."

■ The regulations the board sought to incorporate were from a "standard code," *i.e.*, the Ohio Sanitary Code, which was later made part of the Ohio Administrative Code. However, reference to the "standard code" sections, without more, was not enough to comply with the publication requirements of R.C. 731.231, which requires that the "standard code" sought to be incorporated by reference must be identified and the purpose of the standard code must be stated in the publication.

■ We note that we do not have the newspaper clipping of the publication of the board's proposed regulation in the exhibits presently before us on appeal. We do, however, have the testimony of Vicki Newdigate who read the full text of the pertinent portion of the publication into the record. We have cited this testimony previously. From our review of the testimony, we conclude that the "standard code" sections sought to be incorporated by reference were sufficiently identified to comply with the first publication requirement of R.C. 731.231 as the publication referred to the precise section of the Sanitary Code the board sought to incorporate. Likewise, the purpose of the code was sufficiently obvious on the face of the publication to comply with R.C. 731.231. However, we can find no mention in Vicki Newdigate's testimony that a complete copy of the "standard code" sections at issue were on file for the public's inspection. Such an omission renders the publication ineffective for lack of full compliance with R.C. 731.231.

■ Since the incorporation by reference of the Ohio Sanitary Code was incomplete, it was insufficient to comply with R.C. 731.231. We therefore find that the board's regulation was not properly published. Without proper publication, the board's regulations lacked the force and effect of law, and evidence of the regulations was therefore properly excluded.

■ Assuming, *arguendo*, that the board's regulations had been properly published, we would still conclude that the proposed regulations lacked the force and effect of law. The Warren County Board of Health did not have the power to enact legislation pertaining to the operation of pools. Generally, the legislative authority of the state is vested in the General Assembly. However, legislative acts which grant quasi-legislative authority to a board or administrative agency are upheld as long as the General Assembly has established the policy and standards within which the board or agency will function. *Burger v. Thomas* (1975), 42 Ohio St.2d 377, 384, 71 O.O.2d 366, 370, 329 N.E.2d 693, 698. *Burger* explained how this authority may be delegated:

"Such grant of power, by virtue of a statute, may be either express or implied, but the limitation put upon the implied power is that it is only such as

may be reasonably necessary to make the express power effective. In short, the implied power is only incidental or ancillary to an express power, and, if there be no express grant, it follows, as a matter of course, that there can be no implied grant. In construing such grant of power, particularly administrative power through and by a legislative body, the rules are well settled that the intention of the grant of power, as well as the extent of the grant, must be clear; that in case of doubt that doubt is to be resolved not in favor of the grant but against it. It is one of the reserved powers that the legislative body no doubt had, but failed to delegate to the administrative board or body in question." *Id.* at 383, 71 O.O.2d at 369, 329 N.E.2d at 697.

In this case, the board could enact the regulations only if the General Assembly had expressly or impliedly delegated to it the authority to regulate in this area. R.C. Chapter 3749, which permits a board of health to regulate swimming pools, was enacted on September 10, 1987. This was more than a year after Thumper's death. Prior to this time, the General Assembly had not legislated in the area nor had it expressly delegated the authority to do so to an administrative agency or board of health. Regulations enacted by an agency are invalid when there is no authority for the regulation delegated to the agency by the General Assembly. *Burger, supra,* at syllabus. Since the General Assembly had not, at the time of Thumper's death, delegated the authority to the board to regulate in the area of swimming pool operations, the board's attempt to do so was an invalid exercise of authority. Furthermore, since there was no express delegation there could, perforce, be no implied delegation of authority. *Id.,* 42 Ohio St.2d at 383, 71 O.O.2d at 369, 329 N.E.2d at 697.

Finally, Jackson argues that the board had the authority to regulate in this area because a board of health has wide latitude in regulating matters pertaining to the public health, citing *Weber v. Bd. of Health* (1947), 148 Ohio St. 389, 35 O.O. 351, 74 N.E.2d 331, at syllabus. See, also, R.C. 3709.21. She claims that the adoption of a regulation requiring lifeguard chairs to have a clear, unobstructed view of the pool bottom is a matter of public health because such a requirement protects the public from unnecessary risks associated with swimming.

Appellant cites no authority in support of this argument. Our review of R.C. 3709.21 reveals that the General Assembly listed specific areas in which a board of health could regulate. These areas include: the prevention or restriction of disease; the prevention, abatement, or suppression of nuisances; and the regulation of various types of waste disposal. All of the specific areas are of the same general nature and relate to the protection of the public's physical health.

When we apply one of the standard rules of statutory construction, *expressio unius est exclusio alterius* (the inclusion of one is the exclusion of others), we conclude that R.C. 3709.21 does not authorize a board of health to regulate in the area of lifeguard chair placement. Regulations which are directed to the avoidance of unnecessary risks at swimming pools pertain more to public safety concerns than to public physical health concerns. R.C. 3709.21 does not authorize a board of health to regulate matters pertaining to public safety.

Based on the foregoing analysis, we conclude that the trial court properly found that the board did not have the authority to promulgate regulations in the area of swimming pool operations. Therefore, it was not error for the court to exclude evidence of the regulations since the regulations lacked the force and effect of law.

The second assignment is overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

WILSON and GRADY, JJ., concur.